**Hester S. Meyer, Appellant, v. Arthur Meyer, Appellee. Arthur Meyer, Appellee, v. Hester S. Meyer, Appellant.**

**Gen. No. 43,303.**

Opinion filed April 11, 1946. Released for publication May 16, 1946.

TEED & JOHNSON, of Chicago, for appellant; HUGH E. JOHNSON, of Chicago, of counsel.

CANTWELL & CANTWELL, of Chicago, for appellee; ROBERT E. CANTWELL, JR. and YAGER CANTWELL, both of Chicago, of counsel.

OPINION ON PETITION FOR REHEARING.

MR. PRESIDING JUSTICE FRIEND delivered the opinion of the court.

A petition for rehearing having been granted in this cause, we have carefully re-examined the record and the authorities cited which pertain to the jurisdictional question raised by the pleadings, and especially the propriety of the order of reversal directed in our original opinion.

It appears from the record that on December 28, 1942 the plaintiff, Hester S. Meyer, filed a complaint in the circuit court against her husband, Arthur

Meyer, for a divorce on the ground of desertion, seeking the care and custody of their two minor children. Three days thereafter defendant filed a formal answer admitting substantially all the allegations of the complaint except the charge that he had deserted her and the assertion that plaintiff had at all times conducted herself toward him in a manner becoming a good, true and affectionate wife. Simultaneously he also filed a counterclaim alleging that he had always conducted himself toward plaintiff as a dutiful and affectionate husband, that his wife had wilfully deserted him without any reasonable cause or provocation on November 1, 1941, and he asked that a decree for divorce be entered in his favor and that he be awarded the care and custody of the minor children. Plaintiff's answer of January 5, 1943 to defendant's counterclaim denied his allegations with respect to her desertion and asked that the counterclaim be dismissed for want of equity. A stipulation was then entered into by counsel for the respective parties that the matter be set for immediate hearing, and the cause proceeded to trial at noon on January 11, 1943, some 14 days after the complaint was filed. Mrs. Meyer was represented by counsel but was not present at the hearing, being then confined as a patient at the North Shore Health Resort, in Winnetka, Illinois. Defendant testified that his wife had deserted him on November 1, 1941 without cause, and two other witnesses stated in corroboration of his testimony that the parties had been living separate and apart since that date, and that in their opinion Mr. Meyer was a fit and proper person to have the care and custody of the children. Following the defendant's examination by his counsel, Judge LYNCH interrogated Mr. Meyer as follows: "Q. What happened on November 1st, 1941, that might be the cause of her leaving? A. Nothing particularly that I can think of to cause her to leave.

Q. Were you present at the time she packed? A. Well, she has gone on several occasions. When she left this time, I wasn't there. Q. Did she leave a note or anything? A. No, she did not. Q. When was the next time you saw her? A. I don't recall, Judge. Q. You do not know why she left? A. No, I do not. Q. Did she say to you that she was dissatisfied with married life? A. She has said that a number of times. Q. Do you know any reason why she was dissatisfied? A. No, I do not. Q. When did she go to the sanitarium? A. She went there in October, 1942, I believe. Q. What is the reason she is in the sanitarium? A. I can't tell you that, Judge. Q. You have not lived with her since November 1st, 1941? A. No, sir.'' At the conclusion of the hearing the court indicated that the decree would be granted on defendant's counterclaim, awarding custody of the children to defendant, and after the testimony was written up and submitted to the chancellor, a decree for divorce was entered on January 18, 1943.

Subsequently, on May 11, 1944, plaintiff filed a petition in the circuit court, alleging that at the time of the entry of the decree she was in ill health and had no definite plans for the immediate future, but she had since recovered her health, was permanently located in Orange, New Jersey, employed by the Beard School in that city, and had space and accommodations for the two minor children, and accordingly sought a modification of the decree granting her the privilege of having the children with her for at least half of the summer vacation and for other periods during the year. Defendant answered her petition, denying her right to a modification of the decree because of her habits, state of health and temperament, and averring that the best interests of the children would not be served by dividing their custody. Shortly thereafter plaintiff filed the petition upon which this proceeding is predicated,

collaterally attacking the decree on the ground that the circuit court lacked jurisdiction of the subject matter, thus rendering the decree void, and asking that it be expunged of record. Defendant filed an answer, denying the allegations touching upon the question of jurisdiction, and averring that plaintiff was a resident of Cook county when the complaint was filed by her counsel. Hearing on the petition and the answer thereto was set before the chancellor, but at the outset he indicated that he was primarily interested in plaintiff's "state of mind," as he characterized it, and "whether she was capable of understanding the proceeding that she was in." The chancellor had indicated his desire to have Messrs. Davis and Gorham present, and they were present in court, but after interrogating plaintiff as to her memory of events that occurred before the complaint was filed in the divorce proceeding, to ascertain whether any fraud had been practiced upon her, the chancellor indicated that it would not be necessary for counsel to testify, and at the conclusion of plaintiff's evidence granted defendant's motion to dismiss Mrs. Meyer's petition for want of equity.

The only question presented is whether plaintiff made out a prima facie case on the proposition that the decree of divorce was null and void for want of jurisdiction, her position being that neither of the parties was a resident of Cook county at the time the divorce proceeding was instituted, as required by statute (Ill. Rev. Stat. 1941, Divorce, ch. 40, par. 6 [Jones Ill. Stats. Ann. 109.173]). The salient facts essential to a consideration of this question may be summarized as follows: The parties were married in Chicago, Illinois, on December 27, 1923 and resided in this city for about 10 years, but in 1933 they purchased a home at 428 Fulton street, Geneva, Kane county, Illinois, and resided there continuously until their final separation. Two children were born of the marriage, Shel-

don, now 19 years of age, and Priscilla, aged 15. In September 1942 both children were sent away to school, Sheldon to an academy at Lawrenceville, New Jersey, and Priscilla to the Beard School for Girls at Orange, New Jersey, and both continued in these respective schools until the close of the academic year in June 1944.

It appears from plaintiff's evidence that she was addicted to the excessive use of alcohol, and from the middle of October 1941 until January 11, 1943 she was a patient in various sanitariums. She was treated at the Martha Washington Hospital, 2318 West Irving Park boulevard, Chicago, part of October, all of November and until December 24, 1941. She then spent the Christmas holidays at the home of the parties in Geneva, and from December 28, 1941 until October 26, 1942 she was a patient in the Milwaukee sanitarium at Wauwatosa, Wisconsin. A day or two after leaving the Milwaukee sanitarium she entered the North Shore Health Resort at Winnetka, in Cook county, Illinois, where she remained as a patient until January 11, 1943, the day on which the original divorce proceeding was heard in the circuit court. On each occasion when she entered a sanitarium she was driven there by the defendant in his car, and he obligated himself for the expense to be incurred and paid the bills in large part with plaintiff's money.

Mrs. Meyer was the beneficiary of a trust fund settled on her by her cousin, Edwin Gould, about 1924, and until about 1942 the income from the trust averaged $1,000 a year. Shortly after the respective births of the children, trusts were established for them by Mr. Gould, the income for each trust varying from $500 to $800 per year. The income from all three trusts was paid to plaintiff and applied by her to the maintenance and upkeep of the children and the home. In the 12-year period from 1931 to 1942 inclusive, this income exceeded $24,000. In 1933 Gould gave plaintiff

$5,000 to be used on account of the purchase of the Geneva home for $11,000. Defendant, who handled the details of the purchase, made a down payment of only $4,000 and gave a mortgage for the $7,000 balance. The other $1,000 was used to purchase rugs, draperies and other furnishings.

In September 1934 plaintiff received a legacy from her uncle, Edward Sheldon, in the net amount of $9,941.67. That money was used and applied on the home expense. Plaintiff's contribution to the home expense for the 12-year period consisted of trust income, gifts and legacy aggregating about $40,000, or an average of nearly $300 per month.

In 1938 the first mortage on the Geneva home in the sum of $7,500 was taken over by the Chase National Bank of New York as trustee and became a part of the corpus of the trust held for plaintiff's benefit. From then until the end of 1942 the interest was paid by defendant semiannually, then paid by the trustee to the plaintiff and turned over by her to the defendant. In December 1942 a mortgage for an unspecified amount was made on the Geneva property.

At the times the plaintiff was a patient at the various sanitariums defendant was in touch with her constantly and visited her frequently. During that time she would go home for a few days at intervals such as Thanksgiving 1941, Christmas 1941, and September 1942, when the children were preparing to go to school. On one occasion in the summer of 1942 defendant called for plaintiff at Wauwatosa and took her to Milwaukee, where they had dinner, attended the theater, registered at the Schroeder Hotel as husband and wife, and defendant then returned her to the sanitarium about noon the following day. Plaintiff testified that on some of the occasions when she returned to the Geneva home and during their visit at the Schroeder

Hotel in Milwaukee she cohabited with her husband. Defendant admits that she was at home on the occasions mentioned and that they spent the night at the Schroeder Hotel, but denies that they lived as husband and wife on any of those occasions. There was also another visit at the Schroeder Hotel on a summer afternoon in 1942, when the parties registered as husband and wife and, as plaintiff testified, cohabited together as such. It was during this visit in Milwaukee that defendant told plaintiff he wanted a divorce, and thereafter he became insistent upon obtaining her consent thereto. Mrs. Meyer was at that time a patient in the Milwaukee sanitarium, and she testified that defendant told her that she should come to Cook county, Illinois, so that proceedings for divorce could be instituted here. The record discloses that defendant is a lawyer admitted to practice in Illinois and in good standing, but not presently engaged in the practice of law. Although he employed counsel it appears that throughout the events hereinbefore related, he negotiated directly with plaintiff. He saw her frequently and evidently discussed their property rights with her. Plaintiff testified that about December 1942 Mr. Sidney S. Gorham, who had previously drawn a will for her and was a friend of long-standing of both Mr. and Mrs. Meyer, informed her that he needed the assistance of a divorce expert, and shortly thereafter he called in Mr. Benjamin B. Davis, who met with plaintiff and her attorney, Mr. Gorham, and the draft of an agreement was handed to her and read by the additional counsel, Mr. Davis. The agreement was subsequently signed by plaintiff at a time and under circumstances not disclosed of record, and she was furnished with a copy thereof. By the terms of the agreement defendant took over plaintiff's half interest in the Geneva home for $1,800, payable $50 per month, and he gave her notes therefor with interest after

maturity. No security was provided. The mortgages at the time exceeded the original mortgage and therefore the only equity in the home was the original down payment of $4,000. Although the agreement makes no provision for the support and maintenance of plaintiff, five or six paragraphs thereof are devoted to barring the parties from respective claims against each other's property. One of the paragraphs relates to the custody of the children. The contract provides that the attorneys' fees were a direct obligation of defendant to plaintiff's counsel, and if such fees were paid, as they presumably were, plaintiff had nothing to do with the transaction and never received any of the money with which to pay her counsel.

Although plaintiff identified her signature to the original complaint, she testified on the hearing of her petition that her mind was not clear at the time, that she was confused, and that she had no definite recollection of when or where it was signed, although she assumed it was signed while she was a patient at the North Shore Health Resort at Winnetka. The original complaint is unverified; it does not contain the usual prayer for alimony, child support, attorneys' fees, costs and adjustment of property rights. In the original case the answer and counterclaim of defendant were signed by him and his counsel, plaintiff's answer to the counterclaim was signed for her by her counsel. The decree does not bear the approval of either party to the suit, nor does it find that plaintiff was a resident of Cook county at the time the suit was filed; it merely recites that plaintiff "is now an actual resident of the County of Cook."

Paragraph 6, chapter 40, Illinois Revised Statutes 1941, provides that "The proceedings shall be had in the county where the plaintiff resides . . . ." The proof shows that at the time of the commencement

of the suit and during its progress, both parties actually resided in Geneva, Kane county, Illinois. They had no other home. Plaintiff testified that when she returned to her home in Geneva from Wauwatosa she resumed drinking and "Mr. Meyer became very angry and he told me that he was going to take me to the North Shore Health Resort and I said, 'Oh, no, I am not going to any more sanitariums' and Mr. Meyer took off his coat and rolled up his sleeves and went out in the garage and brought back a long rope and he said 'I'll tie you up and drag you there but you are going.' I ran out of the room downstairs, upstairs to the bath room and locked the door, and cut both my wrists. . . . Mr. Meyer pounded on the door and tried to open it and my mother finally persuaded me to open it and they brought me downstairs and I said I would rather die than go. My mother said 'I can't leave you here with him,' she said, 'You have got to go.' I was bleeding and my wrists were bound up so she said, 'I cannot take the responsibility. I don't know what he will do' and so they took me there [North Shore Health Resort]." Plaintiff's mother, her twin sister and her husband accompanied her to the sanitarium, and when she was admitted she was placed in the psychiatric section of that institution. Nor can it be fairly contended that she was content to remain there because she frequently expressed a desire to go back to her home in Geneva. The most that can be said of her residence in Winnetka is that she stayed in the sanitarium for the purpose of being cured of alcoholism. Her residence there was neither voluntary, *bona fide* nor with the *animus manendi* contemplated by the statute, and therefore defendant's contention "that two months' presence [in the North Shore Health Resort] coupled with a definite purpose in staying for an indefinite period of time constitutes residence," is not

in harmony with the facts of record nor the requirements of the statute and the authorities construing it. In support of his contention that plaintiff was a resident of Cook county within the meaning of ch. 40, par. 6, defendant cites only one case, *Way v. Way,* 64 Ill. 406. Even a cursory reading of that decision does not support defendant's contention. Plaintiff also relies on it, and with good reason, because the court in construing the identical section of the statute here under consideration specifically held that all suits for divorce must be commenced in the county where the complainant resides, and characterized the language of the statute as follows: "The words are simple and expressive, and the meaning would seem to be obvious. The bill shall be filed in the county in which the complainant resides. The language is imperative, and excludes the right to commence proceedings in any other county than the one in which the residence of the complainant is fixed. Residence is made a prerequisite to the existence of the right to file the bill."

■■ The authorities in this State are in accord that in order to establish a new residence, a person must abandon a former one and take up a new residence with an *animus manendi.* Something more than a mere existence in the county is required (*Way v. Way, supra*) ; and where an actual *bona fide* residence is lacking, the court cannot acquire jurisdiction of the subject matter, and the proceedings are void. It was so held in the recent case of *Dean v. Dean,* 381 Ill. 514, wherein the court held that "The statute is specific in directing that the proceedings shall be had in the county where the plaintiff resides. It makes the residence of the plaintiff in the county where the suit is to be filed a prerequisite to the existence of the right to file a complaint [citing *Way v. Way, supra, Horix v. Horix,* 256 Ill. App. 436, *In re Estate of Goldberg,* 288 Ill. App. 203]."

■■ The law is also well settled that jurisdiction of the subject matter cannot be conferred by the par-

ties, and therefore the question of jurisdiction can be raised at any time by direct or collateral attack. In *Wood v. First Nat. Bank of Woodlawn,* 383 Ill. 515, the court pertinently held that "If there is a total want of jurisdiction in a court, either as to the subject matter or as to the parties, its proceedings are an absolute nullity and no rights are created by them, and they may be pronounced void when collaterally attacked." Likewise, in *Werner v. Illinois Cent. R. Co.,* 379 Ill. 559, the court held that "Jurisdiction could not be conferred by consent of the parties and was not waived by defendant's appearance and participation in the trial. It is a question that may be raised at any time, even on appeal"; and in *Toman v. Park Castles Apt. Bldg. Corp.,* 375 Ill. 293, the court said: "It is a familiar rule that when a court has no jurisdiction of the subject matter, it cannot be conferred by consent, and when lack of jurisdiction appears the court should decline to proceed further in the cause. . . . Whether the question of jurisdiction was raised in the lower court is immaterial. There can be no waiver of jurisdiction of the subject matter where the trial court lacked jurisdiction to enter the order appealed from. [Citing authority.] A party is not estopped by failing to raise the question in the trial court." In *Hawkins v. Hawkins,* 350 Ill. 227, the court again held that "The question of jurisdiction of the subject matter has not been raised, but where such jurisdiction does not exist, it cannot be conferred by consent or acquiescence." It would be idle in this proceeding to argue that Mrs. Meyer had any intention of establishing a residence in Cook county within the contemplation of the statute, any more than it could be urged that she intended to become a resident of the State of Wisconsin while confined in the sanitarium at Wauwatosa for nine or ten months prior to her admission to the North Shore Health Resort.

■ Defendant is practically forced to the position of conceding that the foregoing conclusions are sound

because his principal argument is confined to the alternative proposition that "assuming that the divorce decree herein is null and void, equity will not permit the plaintiff to raise the question of jurisdiction" because "A. plaintiff has accepted benefits under the divorce decree herein [and] B. plaintiff by filing suit and by waiting a year and a half before attacking the divorce decree has authorized and ratified said decree." The argument that Mrs. Meyer accepted the benefits of the decree and therefore cannot repudiate it is predicated upon the provisions of the contract between the parties which was introduced in evidence upon the hearing, whereby she "accepted $1800 in $50 installments since December 1st, 1942," in consideration of her release of a one half interest in the Geneva home, and the payment, as defendant contends, of some $300 fees to her counsel. Inasmuch as the equity in the Geneva home was paid for entirely by funds derived from Mrs. Meyer's relatives and really belonged to her, it seems naive to characterize this settlement as an acceptance of benefits by her. We are not unmindful, of course, that a court of equity will not permit a party to enter into an agreement in regard to the terms of a decree of divorce and after having received the benefits to be derived therefrom, repudiate it (*Boylan v. Boylan,* 349 Ill. 471; *Guelzo v. Guelzo,* 292 Ill. App. 151; *Kuebler v. Kuebler,* 204 Ill. App. 256; and *VanSickle v. Harmeyer,* 172 Ill. App. 218), but these decisions deal with situations where the decree specifically conferred a benefit on the party seeking to repudiate it, and in every instance the court could have enforced the exercise of its power in the event of noncompliance. In this proceeding the $50 monthly payments and the provision for attorneys' fees were covered by an agreement made before the decree was entered, of which the court had no knowledge, and presumably it could not have enforced the $50 monthly payments because there was nothing of record upon

which an enforcing order could be predicated. · As a result of this state of the record defendant could have refused to pay and plaintiff would have had to resort to a suit at law without the usual equitable remedies afforded for the enforcement of the provisions of the decree.

In support of the remaining contention that plaintiff has authorized and ratified the decree because she waited 18 months before attacking it, defendant relies principally on *Guggenheim v. Guggenheim,* 189 Ill. App. 146. In that case Mrs. Guggenheim obtained the decree and under it received $150,000. Eight years later she sought to attack the decree upon the ground that fraud had been committed upon the court which granted it. In the interim the divorced spouse married an innocent party and a child was born of such marriage. The court held that plaintiff had knowledge of the fraud and actually participated therein and that under all the circumstances of the case the doctrines of clean hands, estoppel, laches and acceptance of benefits should be invoked against her, and on appeal the ruling of the chancellor was affirmed. We find nothing in this record comparable to the *Guggenheim* case. In this proceeding plaintiff's only act was the signing of an unsworn complaint alleging that she was a resident of Cook county. She testified that while she was at the North Shore Health Resort Mr. Meyer told her that he was getting a divorce and that it could be procured in Cook county. "I said, 'How can you get it in Cook County when I am not a resident of Cook County?' He said, 'Oh, that's just a technicality, that can be arranged.' I said, 'Well, I don't understand it and I never have understood it.' " After she signed the bill defendant procured the decree. Plaintiff was not even present at the hearing, and if any fraud was committed upon the court she took no part in it.

Other cases cited by defendant enunciate the general proposition that where one successfully invokes the jurisdiction of the court he is estopped from afterward questioning its jurisdiction. *Stewart v. Stewart,* 231 Ill. App. 159; *Grimm v. Grimm,* 302 Ill. 511. The record in this case rebuts the contention that plaintiff was the moving party in invoking the jurisdiction of the court. That she was a chronic alcoholic is fully admitted by both counsel and by plaintiff herself in her testimony upon the hearing of the petition; and the record shows that immediately preceding the filing of her suit she had spent over 12 months in sanitariums trying to cure her alcoholism. Her testimony indicates that while she was at the North Shore Health Resort she was mentally disturbed, confused and incapable of making a decision as to whether a suit for divorce could properly be filed in Cook county; and when she demurred to the filing of the suit in this county because she was not a resident here, defendant persuaded her to file here on the assurance that it was "just a technicality, that can be arranged." The plain inference from plaintiff's evidence is that defendant planned to have the divorce proceeding brought in Cook county so as to avoid the publicity that would have attended such a proceeding in the smaller community of Kane county where they had long resided, and that he induced his wife to sign a complaint, prepared by him or his counsel, alleging residence in Cook county, in furtherance of that plan.

*Riddlesbarger v. Riddlesbarger,* 324 Ill. App. 176, is the subject of considerable comment and discussion by both counsel. The opinion in that case was written by Mr. Justice SCANLAN and filed in November 1944. We think it bears a striking resemblance to the case at bar in many of its salient aspects. Both husbands were lawyers but did not practice their profession, and there were minor children in both instances. In the *Riddlesbarger* case the parties were residents of Cook county

and the divorce was obtained in Kane county. In this proceeding the counties are reversed. In both instances the wife's action was dismissed on the husband's motion at the close of plaintiff's case. There were out-of-court agreements in both cases and in neither instance were they brought to the attention of the court or made a part of the decree. The wife's lawyers were paid directly by the husband. There was no service of summons in either case. In the *Riddlesbarger* case the wife was permitted to sit in the court room where she could see but not hear what was going on. In this case Mrs. Meyer merely signed the complaint and was not even present in court when the hearing was had, and in fact she was not consulted or advised until later informed by the defendant that a decree had been granted.

Defendant seeks to distinguish the *Riddlesbarger* case on the ground that one day was the length of time upon which the requirement of residence was based and that the general testimony of the defendant, not only with respect to his residence but otherwise, was predicated upon perjured evidence. The authorities are in accord that the duration of residence is immaterial if the *animus manendi* is lacking. *Way v. Way,* 64 Ill. 406; *Saul v. Saul,* 122 F. (2d) 64. With respect to the perjured testimony it may be conceded that the degree of perjury in the *Riddlesbarger* case was more flagrant, but defendant in this proceeding also testified falsely and failed to make a full and truthful disclosure to the chancellor when interrogated by him. Desertion was a material issue and defendant charged that plaintiff had wilfully deserted him November 1, 1941. Upon hearing he testified that his wife left him at the Geneva home on that date. When questioned by the court he stated that nothing in particular happened to cause her to leave, that he was not present when she left, that he did not recall when he next saw her, that he did not know why she left, that

she had said a number of times that she was dissatisfied with married life and that he knew nó reason therefor, that he believed she went to the sanitarium in October 1942, when, as a matter of fact, she went there in October 1941, a month before the claimed desertion, and was taken there by defendant, and that he could not tell why she was in the sanitarium. In defendant's sworn answer filed in this proceeding he says that his wife entered the Martha Washington Home of Chicago in October 1941 and remained there all of that month and during November and December. When called as a witness he said that he took her there in the early part of October 1941 and that she remained there until about Christmas of that year. His sworn answer and testimony cannot be reconciled with the assertion that she deserted him November 1, 1941. His reply to Judge Lynch's inquiry that he did not know why his wife was in the sanitarium was deliberate perjury. He was fully conversant with the reasons for her being there and all the circumstances that led to her confinement, and if the truth had been disclosed to the chancellor the decree would certainly not have been entered. With respect to the concealment from the chancellor that an agreement existed, the plain inference is that it was an inequitable agreement.

Upon oral argument of this cause counsel for defendant stated that the record showed that plaintiff was such a chronic alcoholic that it was absolutely necessary to place her in various sanitariums. We are satisfied that during the period in question her unfortunate habits had affected her mentally as well as physically, and it was an easy matter for her lawyer husband to deceive the court, to her great injury.

In our original opinion we indicated that the chancellor should have granted plaintiff's petition to expunge the divorce decree, and because of his failure so to do we reversed the order entered and remanded the

cause with directions "that an appropriate order be entered in harmony with the views herein expressed." Since defendant's petition for rehearing was allowed, we have re-examined the record, and find that because of the chancellor's primary concern with the mental condition of Mrs. Meyer, an orderly hearing of plaintiff's petition challenging the jurisdiction of the court, and defendant's answer thereto, was never had, but instead the inquiry was directed primarily to Mrs. Meyer's mental condition and her ability to understand the nature of the proceeding.

We adhere to our conception of the law relating to the question of jurisdiction and plaintiff's right to challenge it, as set forth in our original opinion and here repeated, but we think the parties were not afforded an opportunity to adduce the competent evidence available and to have the controversy determined upon the issues made up by the pleadings. Accordingly, the order of the circuit court is reversed and the cause is remanded for a new trial.

*Order reversed and cause remanded for a new trial.*

SCANLAN and SULLIVAN, JJ., concur.