**Lillian Buck, Appellant, v. Gordon Buck, Appellee.**

**Gen. No. 44,521.**

Opinion filed May 18, 1949. Released for publication June 17, 1949.

Sol R. and Irving Friedman, of Chicago, for appellant.

No appearance for appellee.

Mr. Presiding Justice Burke delivered the opinion of the court.

Lillian Buck and Gordon Buck were married at Chicago, Illinois, on July 20, 1923, and lived and cohabited as husband and wife until March 14, 1943. No children were born of the marriage. Lillian Buck filed a complaint for separate maintenance in the circuit court of Cook county. On June 25, 1943, following an *ex parte* hearing, that court entered a decree finding that on or about March 14, 1943, defendant wilfully deserted plaintiff without any cause or provocation on her part, and that plaintiff was living separate and apart from him through no fault on her part. Based on a finding that defendant's income was $7,900 per year, the court decreed that he pay to her $260 per month for her permanent alimony and support, and that he pay her attorneys' fees. On June 14, 1946, plaintiff filed a petition in the cause in which the decree for separate maintenance had been entered, representing that since the entry thereof, defendant's income had increased "enormously"; that he was then earning between $35,000 and $50,000 per annum; that since the entry of the decree her needs had increased; that prices had also increased substantially; and that the circumstances of the parties had materially changed. She prayed that the decree be modified accordingly, and that she be awarded a reasonable fee for her attorneys.

In an answer filed by defendant he stated that the separate maintenance decree was not in full force and effect for the following reasons: (a) On October 27, 1944, a complaint for divorce was filed in his behalf in the Second Judicial District Court of the State of

Nevada, in and for the County of Washoe, to which complaint plaintiff herein, Lillian Buck, as defendant, filed a sworn answer and cross complaint on December 22, 1944, the answer denying that she had treated Gordon Buck, plaintiff therein, with extreme cruelty, and the cross complaint praying for a divorce on the grounds of desertion; (b) on December 23, 1944, plaintiff therein filed a reply to the cross complaint; (c) on January 22, 1945, findings of fact and conclusions of law were filed by the court, the findings of fact including the following:

"That by their mutual agreement plaintiff and defendant have settled and determined their relative property rights and all matters having to do with future support of defendant by plaintiff, pursuant to which agreement plaintiff has paid to defendant, in settlement of all property rights and all of her claims against him to this date, the sum of $1,000.00 in cash, and by which agreement plaintiff is to pay to the defendant, for her support and maintenance, the sum of $275.00 per month, beginning on the 10th day of February, 1945 and continuing until her death or remarriage.

"That on or about the 14th day of March, 1943, the plaintiff did wilfully desert and abandon the defendant, against the will and without the consent of the defendant, and through no fault on her part, and ever since said time has continued to so abandon and desert the defendant, against her will and without her consent, and through no fault on her part."

(d) that thereafter on January 22, 1945, a "judgment and decree" was filed in the cause pending in Nevada, awarding the defendant therein, Lillian Buck, a divorce on the grounds of desertion and further ordering "that the plaintiff be, and he is hereby, ordered and directed to pay to the defendant, for her support and maintenance, the sum of $275.00 per month, beginning

on the 10th day of February, 1945, and continuing until the death or remarriage of the defendant, and that the property settlement and agreement made by the parties be, and the same is hereby, ratified, approved and confirmed;'' (e) that the defendant in the Nevada case, Lillian Buck, was represented by competent counsel and was fully and completely advised in the premises; that the court was fully advised as to the entry of the decree for separate maintenance; and (f) that Lillian Buck accepted the $1,000 aforementioned and has each month accepted the $275 per month awarded to her by the Nevada decree, in lieu of the $260 awarded in the decree for separate maintenance. Defendant herein, Gordon Buck, also denied that his income had increased ''enormously,'' or that he was earning between $35,000 and $50,000 per annum.

A reply by plaintiff, Lillian Buck, alleged that defendant had no ground on which to charge cruelty; that the complaint in Nevada was not filed in good faith; that defendant was enjoined from filing the complaint in Nevada by an injunction issued by the circuit court of Cook county; that on or about December 21, 1944, defendant was in arrears under the separate maintenance decree in the sum of $1,000; that on or about December 21, 1944, the defendant threatened that he would cease all further payments on the decree unless she would obtain a divorce from him in Nevada; that he carried the threats into execution and refused to comply with the decree; that on December 21, 1944, defendant stated to her that he was poor, destitute, that his clothes were in pawn, that he was no longer connected with The Grolier Society, Inc., by which he had been employed; that he was never coming back to Chicago and that she would never receive a dime from him ''unless she acceded to his wishes and obtained a divorce''; that defendant, carrying the threats into execution, caused it to appear that he had ceased his employment at The Grolier Society; that as a matter

of fact he had not ceased such employment; that she was destitute and without any means of support after December 1944; that she filed her cross complaint for divorce in Nevada as a result of defendant's "threats and coercion"; that defendant was never a bona fide resident of Nevada; that she "has never been a resident of the State of Nevada;" that defendant went to Nevada on or about September 15, 1944, solely for the purpose of obtaining a divorce or coercing her to obtain a divorce; that he had no intention of becoming a permanent resident of Nevada; that he was a bona fide resident of Illinois at all times mentioned; that he returned to Chicago shortly after the divorce decree was entered and "never returned to Nevada to live"; that she never resided in Nevada, did not appear in person in any of the proceedings and that on January 22, 1945 she was at the former domicile of the parties at 5000 Marine Drive, Chicago; that she at no time wished to divorce defendant; that she attempted to halt the proceedings in Nevada without success; that the $1,000 alleged in defendant's answer to have been paid to her was applied on the arrearage which had accumulated under the decree for separate maintenance; that the judgment and decree for divorce indicates that defendant had no grounds for divorce; that he was denied any relief under his complaint; that the decree for divorce was granted to her *in absentia* and that she did not have any witnesses, nor were any witnesses present in her behalf; that the Nevada court did not have jurisdiction over the parties or the subject matter; that a fraud was perpetrated upon that court and upon plaintiff; and that the decree entered therein is null and void.

Defendant, Gordon Buck, filed a rejoinder to the reply. Thereupon the cause was referred to a master in chancery to take evidence and report his conclusions of law and fact. There was a full hearing before the master. He found that plaintiff, Lillian Buck,

voluntarily and without any fraud, coercion or duress by the defendant, appeared in Reno, Nevada, and submitted herself to the jurisdiction of the Nevada court; that while there and being represented by counsel, she sought the affirmative relief of divorce awarded to her in her counterclaim; that she accepted as benefits under the Nevada decree $1,000 in cash, her expenses incurred in traveling to Reno, her solicitors' fees, and the further sum of $275 per month as alimony in lieu of the $260 per month awarded to her under the separate maintenance decree; that defendant, Gordon Buck, did not control the proceedings in Nevada and did not, by compulsion, coercion, fraud or threats, induce plaintiff to file her answer and counterclaim for affirmative relief in the Nevada proceedings; that the proceedings in the State of Nevada in which a decree and judgment of divorce was entered on January 22, 1945, ''appeared to be regular and proper in all respects''; that the district court of Nevada, for the County of Washoe, had jurisdiction of the parties and the subject matter; that full faith and credit should be given by the circuit court of Cook county to the decree of divorce entered on January 22, 1945 in the Nevada proceedings; and he recommended that the prayer of plaintiff's petition for modification of the decree of separate maintenance be denied. Objections were filed to his report. The chancellor ordered that the objections stand as exceptions. The case was argued before the chancellor and he entered a decree overruling the exceptions, adopting the findings and conclusions of the master's report, and dismissing for want of equity plaintiff's petition to modify the decree for separate maintenance. Plaintiff, appealing, prays that the decree be reversed and that the cause be remanded with directions to grant the prayer of her petition. Defendant did not appear or file briefs in this court. The attorneys who represented him in the trial court were appointed *amicus curiae* and have filed

a supplemental abstract and briefs in support of the decree. Hereinafter for convenience as to both cases we will refer to Lillian Buck as plaintiff and Gordon Buck as defendant.

The record does not contain a copy of the complaint filed by defendant, Gordon Buck, in the district court of Nevada. The "answer and cross complaint" filed therein by plaintiff, Lillian Buck, states that as to the allegations of paragraph I of the complaint she "has not sufficient knowledge or information upon which to base a belief and basing her denial upon such grounds, denies each and every allegation of all matter contained in said paragraph." She also admits the allegations of paragraphs 2, 3 and 4 of the complaint. We assume that paragraph I of the complaint contains the allegation that defendant was then and had been continuously during and for more than six weeks immediately preceding the filing of his complaint therein, a bona fide resident of Washoe county, Nevada. It will be observed that paragraph I of the "findings of fact and conclusions of law" make such a finding. The usual practice in drafting such findings is to follow the order of the allegations of the complaint. Paragraph 6 of her answer and cross complaint alleges "as a further and separate defense to the complaint and as grounds for affirmative relief" to be awarded to her, that defendant filed his complaint and instituted his action "claiming as the basis for the jurisdiction of this court that he is, and was for more than six weeks prior to the filing of his complaint herein, a bona fide resident of and domiciled in the County of Washoe, State of Nevada." She prayed that the court give judgment that defendant, Gordon Buck, take nothing by his complaint, and that she be awarded a decree of absolute divorce on the ground of his wilful desertion of her, alimony of $300 per month until her death or remarriage, and for costs of suit and reasonable attorneys' fees. In an affidavit under oath, administered

by a notary public, she deposed that "she has read the foregoing answer and cross complaint and knows the contents thereof, and that the same is true of her own knowledge except as to any matters therein stated on information and belief, and as to such matters she believes it to be true." By her answer and cross complaint she represented to the Nevada court that as to his allegations of residence in that state, she did not have sufficient knowledge or information upon which to base a belief. In the allegations as a basis for a decree for divorce and other relief, she called the attention of the court to the fact that plaintiff in his complaint claimed as the basis for the jurisdiction of the court that he is and was for more than six weeks prior to the filing of the complaint therein, a bona fide resident of that county and State. Neither party claimed that plaintiff, Lillian Buck, was a resident of Nevada. In their pleadings they both recognize that the jurisdiction of the Nevada court to enter a valid decree of divorce was dependent upon Gordon Buck's domicile in that State. The "judgment and decree" entered by the Washoe county, Nevada district court on January 22, 1945, recites that plaintiff, Gordon Buck, appeared in person and was represented by his attorneys; that defendant, Lillian Buck, did not appear in person but was represented by her attorneys; that thereupon plaintiff testified in his own behalf; and that evidence was introduced for and on behalf of the defendant.

The Nevada decree further recites that, it appearing to the satisfaction of the court from the evidence and findings of fact and conclusions of law that "the plaintiff was at the time of the commencement of this suit, and for more than six weeks prior thereto, continuously has been, and still and now is, an actual and bona fide resident of, and domiciled within, the County of Washoe, State of Nevada, and that the defendant has duly appeared herein; and it further appearing

to the satisfaction of the court that all the allegations of defendant's answer and cross complaint are true and are sustained by the evidence and the findings of fact and conclusions of law the defendant is entitled to the relief herein given.'' The court ordered that Gordon Buck take nothing by his complaint; that Lillian Buck be granted a final and absolute divorce on the ground of desertion; that the marriage be dissolved; that he pay her for her support and maintenance the sum of $275 per month beginning on February 10, 1945 and continuing until her death or remarriage; and that the property settlement and agreement made by the parties be ratified.

The record supports the findings of the master and the chancellor that the plaintiff voluntarily and without any fraud, coercion or duress by defendant, went to Reno, Nevada, and submitted herself to the jurisdiction of the Nevada court; that defendant did not control the proceedings in Nevada, and did not by compulsion, coercion or fraud, induce her to file her answer and cross complaint for affirmative relief therein; and that she accepted the benefits of the Nevada decree. After she received notice that her husband had filed a complaint for divorce in Nevada, she took the papers to her Chicago attorney. He told her that he could not represent her in Reno and that if she wanted to go to Reno, he would give her the name of an attorney. He also told her if she wanted to go to Reno, she could do so for the divorce, and that a divorce decree entered in Nevada would not be valid in Illinois if she did not go there. At the time of the filing of his complaint in Reno, Gordon Buck was not advised of the injunction order which had been entered in the separate maintenance proceeding, restraining him from proceeding with any pending divorce complaint in Nevada. Sometime in the second week of December 1944, plaintiff went to Reno, Nevada to contest the divorce action there pending. There she

independently hired a lawyer, who filed her appearance in the Nevada proceedings. She secured the name of this lawyer from her Chicago attorney. She conferred with this lawyer, telling him that her husband was guilty of desertion and that it was not her fault that he was living apart from her. The lawyer showed her the Nevada complaint for divorce. She said that "the most important thing she discussed was the amount of money she was to receive if she subjected herself to the divorce," and that if she was "well taken care of she was willing to take a divorce." She told her lawyer she wanted $300 a month as permanent alimony and a cash settlement. While in Reno she signed a verified answer and counterclaim for divorce. She further invoked the jurisdiction of the Nevada court to obtain temporary attorneys' fees, costs and transportation expenses.

Mrs. Buck went back to Chicago on or about December 22, 1944. She received a telephone call from her attorney on or about January 10, 1945, about two weeks prior to the entry of the Nevada decree. He told her about the terms of the settlement that could be arranged if she would take a divorce. He told her the court was going to grant a divorce, the sum of $1,000 and $275 as permanent alimony. Subsequent thereto she received a copy of the decree for divorce and saw that she was awarded $1,000. After receiving the decree and the check for $1,000, which she deposited in a bank, she talked to her Chicago attorney, who told her there was nothing further he could do. The day after the Nevada decree was entered Gordon Buck went to Sacramento, California, and married Helen Ruth Ellis, and since then they have lived together as husband and wife. Plaintiff knew about this marriage the day after it was celebrated. She admitted that she regularly received the $275 every month since the entry of the Nevada decree, and that she knew that defendant paid her Nevada attorneys the temporary sum of $150.

Plaintiff made no attempt in the courts of Nevada to have the decree entered in that State vacated, annulled or modified.

Plaintiff maintains that the Nevada decree is null and void since neither party was a bona fide resident of that State, and that she is not precluded from showing the invalidity of that decree, citing *Atkins v. Atkins,* 386 Ill. 345; *Atkins v. Atkins,* 393 Ill. 202; *Williams v. North Carolina,* 325 U. S. 226; *Esenwein v. Commonwealth of Pennsylvania ex rel. Esenwein,* 325 U. S. 279; *Latterner v. Latterner,* 3 Nev. 285; *Meyer v. Meyer,* 328 Ill. App. 408; *Meyer v. Meyer,* 333 Ill. App. 450; *Stevens v. Stevens,* 273 N. Y. 157, 7 N. E. (2nd) 26; *Querze v. Querze,* 290 N. Y. 13, 47 N. E. (2d) 423; *Jardine v. Jardine,* 291 Ill. App. 152. The *amicus curiae* answers that the chancellor was correct in holding that the requirements of full faith and credit under sec. I, art. IV of the Federal Constitution barred plaintiff from collaterally attacking the Nevada decree upon jurisdictional grounds in the courts of a sister State, citing *Coe v. Coe,* 334 U. S. 378; *Sherrer v. Sherrer,* 334 U. S. 343; *Chamblin v. Chamblin,* 362 Ill. 588, and other cases. These attorneys also assert that the chancellor was correct in holding that the plaintiff was estopped from asserting the invalidity of the Nevada decree, citing *Boylan v. Boylan,* 349 Ill. 471; *Kuebler v. Kuebler,* 204 Ill. App. 256; *Grimm v. Grimm,* 302 Ill. 511; *Guggenheim v. Guggenheim,* 189 Ill. App. 146, and other cases.

Sec. I of art. IV of the Constitution directs that "full faith and credit shall be given in each State to the public acts, records and judicial proceedings of every other State," and that "Congress may by general laws prescribe the manner in which such acts, records and proceedings shall be proved, and the effect thereof." By the Act of May 26, 1790, Congress has provided that judgments "shall have such faith and credit given to them in every court within the United States as they

have by law or usage in the courts of the State from which they are taken.'' In *Williams v. North Carolina,* 325 U. S. 226, the court said (229):

"Under our system of law, judicial power to grant a divorce—jurisdiction, strictly speaking—is founded on domicil. *Bell v. Bell,* 181 U. S. 175; *Andrews v. Andrews,* 188 U. S. 14. The framers of the Constitution were familiar with this jurisdictional prerequisite, and since 1789 neither this Court nor any other court in the English-speaking world has questioned it. Domicil implies a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance. The domicil of one spouse within a State gives power to that State, we have held, to dissolve a marriage wheresoever contracted. In view of *Williams v. North Carolina, supra,* the jurisdictional requirement of domicil is freed from confusing refinements about 'matrimonial domicil,' see *Davis v. Davis,* 305 U. S. 32, 41, and the like. Divorce, like marriage, is of concern not merely to the immediate parties. It affects personal rights of the deepest significance. It also touches the basic interests of society. Since divorce, like marriage, creates a new status, every consideration of policy makes it desirable that the effect should be the same wherever the question arises.''

In the *Williams* case the court was asked to review judgments of the Supreme Court of North Carolina, affirming convictions for bigamous cohabitation, assailed on the ground that full faith and credit was not accorded divorces decreed by a Nevada court. *Williams v. North Carolina,* 317 U. S. 287, decided an earlier aspect of the controversy. In the first *Williams* case it was held that a divorce granted by Nevada, on a finding that one spouse was domiciled in Nevada, must be respected in North Carolina, where Nevada's finding of domicile was not questioned, though the

other spouse had neither appeared nor been served with process in Nevada and though recognition of such a divorce offended the policy of North Carolina. On a retrial of the *Williams* case, the issue which emerged was whether North Carolina had the power "to refuse full faith and credit to Nevada divorce decrees because, contrary to the findings of the Nevada court, North Carolina finds that no bona fide domicil was acquired in Nevada." In the second *Williams* case the court said that the decree of divorce is a conclusive adjudication of everything except the jurisdictional facts upon which it is founded, that domicile is a jurisdictional fact, and that to permit the necessary finding of domicile by one State to foreclose all states in the protection of their social institutions would be intolerable. That court further stated that simply because the Nevada court found that it had the power to award a divorce decree cannot foreclose re-examination by another State, that otherwise, a court's record would establish its power and the power would be proved by the record, and that such circular reasoning would give one State a control over all the other states which the full faith and credit clause did not confer. The Federal Supreme Court concluded that North Carolina was not required to yield her state policy because a Nevada court found that petitioners were domiciled in Nevada when it granted decrees of divorce, and that North Carolina was entitled to find as she did, that they did not acquire domiciles in Nevada and that the Nevada court was therefore without power to liberate petitioners from amenability to the laws of North Carolina governing domestic relations. In our opinion the second *Williams* case is not applicable to the factual situation presented by the case at bar, because there the Nevada court's jurisdiction over the nonresident defendant was acquired by constructive service, and the defendant, a nonresident of that forum, was not

served within the jurisdiction of the forum, nor did he appear in the divorce action, so that he had no opportunity to litigate the issue of domicile. Our remarks with respect to the *Williams* case apply to the case of *Atkins v. Atkins*, 393 Ill. 202, for in that case the defendant did not file an appearance or submit to the jurisdiction of the court.

 In our opinion the decrees and reasoning in the cases of *Chamblin v. Chamblin*, 362 Ill. 588; *Coe v. Coe*, 334 U. S. 378; and *Sherrer v. Sherrer*, 334 U. S. 343, sustain the decree entered by the chancellor in the instant case. In the *Chamblin* case the complainant brought a suit in Nevada to set aside the divorce decree obtained by her husband. The decree was entered in her favor, from which the husband appealed to the Supreme Court of Nevada. That court reversed the decree and remanded the cause with directions to dismiss the suit at her costs. While these proceedings were pending, Chamblin filed a second suit for divorce in Reno. Evidence was heard and a decree was entered in his favor. She appealed to the Supreme Court of Nevada, but upon the decision of that court in the first case, her appeal was dismissed and a second suit for divorce was also dismissed. In the Illinois courts she claimed that the decree for divorce in Nevada was obtained through fraud and that the courts of that State had no jurisdiction because Chamblin was not a bona fide resident of that State when he brought suit. She relied upon the decisions of the Federal and Illinois Supreme Courts which held that the constitutional provision requiring full faith and credit be given to the judicial proceedings of another State, does not prevent an inquiry into the jurisdiction of the court which rendered the judgment or decree, either as to the person or the subject matter, notwithstanding a recital therein of the jurisdictional facts. The Illinois Supreme Court observed that in each of the cases cited

by Mrs. Chamblin the judgment or decree had not been previously assailed on jurisdictional facts in the State where it was rendered. The Supreme Court affirmed the decree, dismissing her amended bill for want of equity.

Our view is that the opinions in the *Sherrer* and *Coe* cases control the instant case. In the *Sherrer* case (334 U. S. 343) it appears that Margaret E. Sherrer and Edward C. Sherrer were married in New Jersey in 1930; that from 1932 until April 3, 1944, they lived together in Massachusetts; that following a long period of marital discord, she, accompanied by their two children, left Massachusetts on the latter day, ostensibly for the purpose of spending a vacation in Flordia; that shortly after she arrived in that State she informed her husband that she did not intend to return to him; that she obtained housing accommodations in Florida, placed her older child in school and secured employment for herself; that on July 6, 1944, she filed a bill for divorce in the circuit court of Flordia, alleging extreme cruelty; and also that she was a bona fide resident of Florida. He received notice by mail, retained Florida counsel, who entered a general appearance and filed an answer denying the allegations of the complaint, including the allegation as to her Florida residence. He appeared personally to testify with respect to a stipulation relating to the custody of the children. Throughout the proceedings he was represented by counsel. She introduced evidence to establish her Florida residence and testified as to the allegations of her complaint. His counsel failed to cross-examine or introduce evidence in rebuttal. On November 29, 1944, the Florida court entered a decree of divorce after finding that she was a bona fide resident of that State and that the court had jurisdiction of the subject matter. He failed to challenge the decree by appeal to the Supreme Court of Florida. On December 1, 1944, she was married in

Florida to Henry A. Phelps, whom she had known while both resided in Massachusetts and who had come to Florida shortly after her arrival there. She and Phelps lived together as husband and wife in Florida until February 5, 1945, when they returned to Massachusetts. In June 1945, Edward Sherrer instituted an action in the probate court of Berkshire county, Massachusetts, alleging that he is the lawful husband and that the Florida decree of divorce is invalid. He prayed that he be permitted to convey his real estate as if he were sole and that the court declare that he was living apart from his wife for justifiable cause. She joined issue on his allegations. The probate court found that she was never domiciled in Florida and granted him the relief requested. The Supreme Judicial Court of Massachusetts affirmed the decree on the ground that it was supported by the evidence and that the requirements of full faith and credit did not preclude the Massachusetts court from re-examining the findings of domicile made by the Florida court.

In reversing the decree the Federal Supreme Court stated that the requirements of full faith and credit bar a defendant from collaterally attacking a divorce decree on jurisdictional grounds in the courts of a sister State where there has been participation by the defendant in the divorce proceedings, where the defendant has been accorded full opportunity to contest the jurisdictional issues, and where the decree is not susceptible to such collateral attack in the courts of the State which rendered the decree; that it had not been contended that Mr. Sherrer was given less than a full opportunity to contest the issue of her domicile, or any other issue relevant to the litigation; that if he failed to take advantage of the opportunities afforded him, the responsibility is his own; and that the dereliction of a defendant under such circumstances should not be permitted to provide a basis for subsequent attack in the courts of a sister State on a decree valid in

the State in which it was rendered. The court stated further (355):

"It is one thing to recognize as permissible the judicial re-examination of findings of jurisdictional fact where such findings have been made by a court of a sister State which has entered a divorce decree in *ex parte* proceedings. It is quite another thing to hold that the vital rights and interests involved in divorce litigation may be held in suspense pending the scrutiny by courts of sister States of findings of jurisdictional fact made by a competent court in proceedings conducted in a manner consistent with the highest requirements of due process and in which the defendant has participated. We do not conceive it to be in accord with the purposes of the full faith and credit requirement to hold that a judgment rendered under the circumstances of this case may be required to run the gantlet of such collateral attack in the courts of sister States before its validity outside of the State which rendered it is established or rejected. That vital interests are involved in divorce litigation indicates to us that it is a matter of greater rather than lesser importance that there should be a place to end such litigation. And where a decree of divorce is rendered by a competent court under the circumstances of this case, the obligation of full faith and credit requires that such litigation should end in the courts of the State in which the judgment was rendered."

The *Coe* case (334 U. S. 378) presented a factual situation similar to the factual situation in the case at bar. In both cases the wives obtained decrees for separate maintenance. Subsequently, both husbands left for Reno, Nevada, and from there notified their wives by publication that they had instituted a suit for divorce in Nevada. Both wives consulted lawyers in their home states and were told they could either let the Nevada case be put through upon a default basis, in which case the Nevada decree would not be

honored upon a subsequent action in the State of the domicile of the wife, or they could go to Nevada and contest the action there. The wives in both cases went to Nevada. After reaching Nevada both wives independently consulted Nevada attorneys. On the advice of independently consulted counsel they entered into a property settlement agreement which contemplated a decree for divorce. Both wives filed an appearance, answer and counterclaim in Nevada and both were awarded a decree of divorce. Both had their property settlement agreements incorporated into the Nevada decree and both received benefits under that decree. Subsequently, both wives returned to their domiciles in Massachusetts and Illinois, respectively, and subsequently filed petitions claiming that their domiciliary states had jurisdiction because of the separate maintenance decree which had been filed and adjudicated prior to the Nevada decree. The husbands, after the rendition of the Nevada decree, remarried immediately and eventually returned to Massachusetts and Illinois respectively. Although Mrs. Buck went to Nevada, remained a week, consulted independent counsel, signed her answer and counterclaim for divorce and the property settlement agreement, she did not stay in Nevada until the decree was signed. Mrs. Buck's decree was granted *in absentia*. There is no showing in the *Coe* case that Mrs. Coe's decree was granted *in absentia*. Mrs. Buck testified that the reason she could not wait for the decree to be entered was that the judge was on a vacation at the time, and that her lawyer told her that she need not be there for the granting of the decree. In the *Coe* case, as in the *Buck* case, neither party challenged the decree by appealing to the Nevada Supreme Court. In the *Coe* case The Federal Supreme Court said (384):

"Thus, here, as in the *Sherrer* case, the decree of divorce is one which was entered after proceedings in which there was participation by both plaintiff and

defendant and in which both parties were given full opportunity to contest the jurisdictional issues. It is a decree not susceptible to collateral attack in the courts of the State in which it was rendered. In the *Sherrer* case, we concluded that the requirements of full faith and credit preclude the courts of a sister State from subjecting such a decree to collateral attack by readjudicating the existence of jurisdictional facts. That principle is no less applicable where, as here, the party initiating the collateral attack is the party in whose favor the decree was entered. For reasons stated at length in the *Sherrer* case, we hold that the Massachusetts courts erred in permitting the Nevada divorce decree to be subjected to attack on the ground that petitioner was not domiciled in Nevada at the time the decree was entered.''

We feel that it is unnecessary to extend this opinion by discussing the other points urged in the briefs. For the reasons stated, the decree of the circuit court of Cook county is affirmed.

*Decree affirmed.*

KILEY and LEWE, JJ., concur.