LYNNE A. HELBIG, petitioner-appellant,

*v.*

LOUIS HELBIG, defendant-respondent.

[Submitted May term, 1928.    Decided October 15th, 1928.]

1. Upon proof of adultery committed during the running of the decree *nisi* period, by the party applying for an absolute divorce and in whose favor such decree *nisi* has been issued, the court of chancery will vacate the *nisi* decree and dismiss the bill for the divorce.

2. Circumstances and conduct on the part of a wife living with her husband and enjoying his protection and support and owing him the actual and seeming loyalty of a true wife, which would properly be taken to indicate guilty inclination on her part in applying the "guilty inclination and opportunity" rule in a suit by the husband for divorce because of her adultery, may with equal propriety be held entirely innocent and not to indicate a guilty inclination in the case of a wife who for more than two years has been willfully and obstinately deserted by her husband, and against whom she has procured a decree *nisi* for an absolute divorce because of such desertion.

3. To justify an order vacating a decree *nisi* and dismissing a bill for divorce during the running of such decree and before the final divorce decree has been entered, because of adultery committed during that period by the party holding the *nisi* decree, the adultery must be established with the same degree of certainty that would be required because of that offense to justify or defeat, as the case might be, a decree for divorce.

On appeal from the court of chancery.

For the appellant, *Messrs. Mulligan & Koenig* (*Mr. George D. Mulligan,* of counsel).

For the respondent, *Messrs. Child & Shipman* (*Mr. Francis Child,* of counsel).

The opinion of the court was delivered by

WHITE, J.

This is an appeal from an order of the court of chancery vacating a decree *nisi* in favor of the wife for an absolute

divorce, and dismissing the bill upon which that decree had been entered. The ground for the order appealed from was alleged adultery by the wife four days before the six months' *nisi* period had elapsed.

The husband had deserted his wife and their son (then about twelve years old), and had willfully and obstinately continued such desertion for a period of two years, whereupon the wife, on September 30th, 1926, upon her petition, was awarded a decree *nisi* for an absolute divorce. At this time and thereafter she and her son, and a Mrs. Davidson, and the latter's two sons, ten and twelve years old, respectively, were living in apartments in a three-family house, 189 Central avenue, East Orange, which the two mothers had rented together, contributing equally to the rent and to the joint expenses of the establishment. Here they were sometimes visited by two single young men, of about their ages, who drove out from Passaic, and the four went to movies together and sometimes to public supper and dance resorts afterward. On the night of March 26th, 1927, they drove out to the Colonial Inn at Singac, where they danced and had sandwiches, and leaving about one o'clock arrived at the women's home at two A. M. of the 27th. According to the testimony of these four, it was a cold night and the men were invited to come in and have hot coffee in the women's apartments before starting on their ten-mile drive to Passaic. A few minutes later the apartments were raided by the husband's sister and her nephew, and four detectives employed in behalf of the husband to secure evidence against his wife. The detectives forcibly broke open the locked street door, shattering the large glass with a hammer, and then at the head of the first flight of stairs burst the upper panel of and broke open the locked door of these women's apartments, which were on that floor. The two detectives who testified, and the husband's sister, say that they found Mrs. Davidson and one of the young men, Rinzler, undressed and in bed together in the bedroom (which was the room broken into), and Mrs. Helbig (the appellant) and the other young man, Alberts, getting up from a sitting position on a divan or couch in the living room, which communicated with the bed-

room by an eight-feet wide open doorway, and that Mrs. Helbig had a towel in her hand, which the detectives took away from her against her violent protest; that Alberts had his coat and overcoat off and his vest unbuttoned while Mrs. Helbig was fully dressed; that the entire flat (which they say had been lighted up for about five minutes after the Helbig party returned and went in, and then the lights turned off) was in utter darkness at the time of the raid, the raiders using flashlights to see what they saw, until, after a minute or so of delay while hunting the switch, the lights were turned on by one of the detectives; and that the detectives captured the towel and Rinzler's vest and also Rinzler's trousers, which latter, however, they did not produce at the trial, saying that they returned them to Rinzler within a few moments after their capture, because Rinzler requested it with much earnestness, and they felt rather sorry for him, as it was a cold night and he had ten miles to drive. We can understand Rinzler's earnestness, but the compassion of the detectives who were hired to procure just such highly suggestive evidence does not seem so convincing.

On the other hand, Mrs. Helbig and Mrs. Davidson and the two young men denied the important parts of this story absolutely. According to their testimony there was a light on the radio between the two rooms, also one in the kitchen, all the time, and, besides, a large arc street light directly in front of the apartments and level with their windows, lighted the rooms thoroughly; that the shades to the windows were not drawn down; that Mrs. Helbig and Mrs. Davidson were in the kitchen making the coffee which the young men had been invited in to take before their cold ride home, and the young men were in the front room, when they heard the crash of glass of the street door at the foot of the stairs with which the raid started, and they all assembled in the front room to see what was happening; that when the appartment door was burst open they were all so standing; that neither Mrs. Davidson nor Mr. Rinzler had been on the bed, nor had either Hrs. Helbig nor Mrs. Alberts been on the divan or couch; that they were all fully dressed except Mr. Rinzler, who was in his shirt sleeves, and that no adultery or other

improper conduct had taken place.    Mr. Rinzler said that
when they came upstairs and the women went into the
kitchen he had to go into the bathroom and remove his coat
and vest, and that he laid them on a chair beside the bath-
room door, because there was not a chair or hook upon
which to hang them in the bathroom, and when the noise of
crashing glass occurred he came out of the bathroom as he was
and joined the others without remembering that he was in
his shirt sleeves, and that one of the detectives picked up his
vest from the chair where he laid it.    He said (and the others
corroborated him) that he did not remove his trousers at all,
and, of course, did not put them on (as the detectives testi-
fied he did) in the presence of the whole group, including
Mrs. Helbig's fourteen-year-old son, Milton, who had been
awakened by the crashing glass and had come into the room
while the detectives, as they testified, were still in possession
of the trousers.    The boy, Milton, also testified that the tes-
timony of the detectives about Mr. Rinzler's trousers was
untrue.    As to the towel, Mrs. Helbig, after describing the
raid into the apartments, was asked:   *Q.* "Now, do you re-
member anything about a towel there?"   *A.* "Yes, I knew
that the towel was hanging over the bed, and the men (the
detectives) were there quite a while standing around, didn't
know what to do, when Mr. Corbally (the head detective)
noticed the towel on the bed and he said, "Look at this," and
he handed it to one of his operators, and I took it out of his
hand, as I resented his taking my property."

Upon the close of the testimony the learned vice-chan-
cellor delivered himself orally as follows: "There is no use
in repetition.    This is not—it is not a decree for divorce.
This is a motion to vacate a decree *nisi,* and the testimony
in support of such an intervening motion is not governed by
the same strict rules as possibly might apply to a case for
divorce on the ground of adultery.    But a decree *nisi* means
that a decree of divorce will be granted within six months—
as it used to be—provided nothing arises in the meantime
which might prevent such a decree from operating.

"It seems to me that this performance at two o'clock in
the morning is such an incident as will fully justify me in

advising a decree vacating the decree *nisi,* but, of course, that does not in any way signify that the vice-chancellor to whom the new divorce case is referred, if one is brought, will decide that adultery has been actually proven.

"All I have to do is to say that, in my opinion, the evidence amply justifies me in vacating the decree *nisi,* which I will do."

· We think this view of the learned vice-chancellor was erroneous. It is, of course, well settled that adultery by the petitioner for a divorce, pending the running of the decree *nisi* period, will result in the vacation by the court of chancery of that decree, and in the dismissal of· the petition for the divorce. *Fuller* v. *Fuller, 41 N. J. Eq. 198* (citing *4 Paige 432,* in which the English authorities are cited); *Dolan* v. *Wagner, 95 N. J. Eq. 1; Moors* v. *Moors, 121 Mass. 232.* Technically, the marriage relation continues until the final absolute decree.

· But that any course of conduct short of the actual commission of the crime of adultery during this period could have this effect, is not only unsupported by any authority, but is also, we think, quite contrary to both justice and reason. "Almost adultery" is no ground for granting a divorce, nor will it defeat a divorce although committed before the granting of the decree *nisi.* Why should it have a different effect while the decree *nisi* is running? Of course it should not. Nothing but the actual offense will answer in any one of these cases. A mere pretense will not do, even though the offending spouse intended to actually go through with a real adultery, and thought he was doing so when interrupted at almost the last moment. *Knittel* v. *Knittel* (unreported); *Bradfield* v. *Bradfield, 100 N. J. Eq. 546.*

There is, however, we think, under some circumstances, one very practical difference between before and after the com- ·mencement of the running of the *nisi* period, and that has to do with the application of the "inclination and opportunity" rule. Circumstances and conduct on the part of a married woman living with her husband, enjoying his support and protection, and owing him, not only the actual, but also the seeming, loyalty of a true wife, might very properly furnish

convincing proof of a guilty inclination on her part, while the same circumstances and conduct in the case of a wife, who, as here, has been deserted and abandoned by her husband for over two years, and in whose favor a divorce decree *nisi* has been granted, and who, consequently, owes him no actual nor seeming wifely loyalty of any kind, might very properly be construed to be entirely innocent, and no proof whatever of such guilty inclination. We do not think the fact that these two single young men drove over from Passaic after their daily work was finished at eight-thirty P. M. about once a week, and called on these two women living with their respective children as they were, and took them to movies or public dance resorts, and accepted invitations to come in their sitting room apartments for hot coffee on four or five occasions afterward before starting on their ten-mile ride home, can, standing alone, properly furnish a foundation upon which to rest a finding of guilty inclination. We think, therefore, that adultery is not established in this case by virtue of the "guilty inclination and opportunity" rule.

This brings us to the vital question, therefore, which is, was the actual commission of the crime of adultery on this morning of March 27th proved against the wife. The learned vice-chancellor in his conclusions does not find as a fact that adultery was committed. On the contrary, he expressly says that his decision does not signify that a succeeding vice-chancellor in the case will decide that adultery has been actually proven. We are relegated, therefore, to the evidence. If we believe the testimony of the two detectives and the husband's sister in its entirety, particularly the parts with reference to the occupied bed, the towel incident as related by them, the dark apartments, and about Mr. Rinzler's trousers, the evidence would, standing alone, be rather persuasive, to say the least, that the crime either had been or (which would not suffice) was about to be committed. On the other hand, the testimony of the four people most concerned on the other side, if true, clearly shows the contrary. All of these parties on both sides are decidedly interested witnesses. Standing alone, the wife's version of the towel incident seems to us

much more likely than that of the detectives, in view of the fact that no offer was made to prove an incriminating condition of the towel. So, also, the denial of the loss by Rinzler of his trousers, and their capture by the detectives, is clearly corroborated by the fact that Rinzler and not the detectives wore or bore the trousers away from the scene. But apart from all this, there were two disinterested witnesses who saw the raid, and one of them testified (and it was admitted that the other would testify to the same thing, but the court declined to hear a mere repetition) that he saw the bed in question when the apartment door was being burst open, and that no one was in or on it; that it was not mussed up or wrinkled, and that all of the four parties in question were standing fully dressed in the middle of the living room when the detectives burst into the apartments. These witnesses occupied the apartments on the floor above and rushed out on the stairs to see what was the matter when they were awakened by shattering of the large glass in the door at the foot of the stairs.

We think that the weight of the evidence, therefore, is against the claim that adultery was committed by the wife, and, consequently, the order appealed from must be vacated, and the decree dismissing the petition for divorce reversed, and the case remitted to the court of chancery in order that a decree of absolute divorce in favor of the wife may be entered in that court; the costs to be borne by the husband, the respondent in this appeal. It is therefore so ordered.

*For affirmance*—KATZENBACH, VAN BUSKIRK, MCGLENNON, HETFIELD, JJ. 4.

*For reversal*—THE CHIEF-JUSTICE, TRENCHARD, PARKER, MINTURN, KALISCH, BLACK, CAMPBELL, LLOYD, WHITE, KAYS, DEAR, JJ. 11.