Arthur Meyer, Plaintiff-Appellee, v. Hester S. Meyer, Defendant-Appellant.

Gen. No. 45,234.

Opinion filed June 13, 1951. Released for publication July 30, 1951.

TEED & JOHNSON, of Chicago, for appellant; HUGH E. JOHNSON, of Chicago, of counsel.

MULDER & FRANKEL, and CANTWELL & CANTWELL, all of Chicago, for appellee; JAMES R. FRANKEL, of Chicago.

MR. PRESIDING JUSTICE BURKE delivered the opinion of the court.

Arthur Meyer and Hester S. Meyer were married at Chicago on December 27, 1923. They were blessed with two children, Sheldon, born June 8, 1926, and Priscilla, born June 28, 1930. On December 28, 1942, Mrs. Meyer filed a complaint for divorce in the circuit court of Cook county on the ground of desertion. Therein she alleged that she was then an actual resident of the

county of Cook and State of Illinois. Three days thereafter Arthur Meyer filed an answer and counterclaim for divorce, also on the ground of desertion. Answering the counterclaim, she denied the allegations with respect to desertion. The parties stipulated that the case be set for immediate hearing. On January 18, 1943, Mr. Meyer was awarded a decree for divorce on the charge of desertion. The respective parties were represented by able counsel. On May 1, 1943, Mr. Meyer, relying on the validity of the decree, married Constance Arts. On June 9, 1945, as a natural result of Mr. Meyer's marriage to Constance Arts, a child, Katina Meyer, was born. On May 11, 1944, almost 16 months after the entry of the decree for divorce, Mrs. Meyer filed a petition for an order modifying the decree as to the custody of the children. On July 11, 1944, she filed a petition collaterally attacking the decree on the ground that the court lacked jurisdiction, thus rendering the decree void and asked that it be expunged. A motion to dismiss her petition was denied and he answered.

A hearing on the petition and answer resulted in the allowance of his motion to dismiss the petition for want of equity. She appealed. In an opinion filed April 11, 1946, the court reversed that order and remanded the cause for a new trial with specific directions. (*Meyer v. Meyer,* 328 Ill. App. 408.) There the court said that "the only question presented is whether plaintiff made out a prima facie case on the proposition that the decree of divorce was null and void for want of jurisdiction, her position being that neither of the parties was a resident of the county of Cook at the time the divorce proceeding was instituted, as required by the statute." The case was assigned to another chancellor, who, after a full hearing, again dismissed the petition for want of equity. In an opinion on the second appeal, filed February 17, 1948 (*Meyer v.*

555

*Meyer,* 333 Ill. App. 450), the court said (457): "As the case comes back on this second appeal, the question of residence has still not been decided." To defendant's contention that plaintiff could not prosecute a collateral attack upon the decree, not based on any infirmities or defects appearing on the face of the record, we said that he waived the rule by failing to object to the trial on the issue of jurisdiction. We concluded by saying (469):

"Although neither of the chancellors made a finding on the question of residence, the evidence warrants only the conclusion that plaintiff did not reside in Cook County at the time her divorce complaint was filed and that her temporary presence in a sanitarium as a patient did not give the court jurisdiction to enter the decree of divorce. Presumably the parties have adduced all the evidence that is possible upon this subject, and it would serve no useful purpose to remand the case for a third trial. Therefore, in view of our conclusions as to the legal aspects of the controversy the order of the circuit court entered July 10, 1946, dismissing plaintiff's petition is reversed and the cause is remanded with directions to expunge the decree of divorce and dismiss the cause at defendant's cost."

The mandate of the Appellate Court was filed in the circuit court on March 10, 1948, and on April 1, 1948, an order was entered expunging the decree for divorce.

On April 2, 1948, defendant, Arthur Meyer, filed a complaint for divorce against plaintiff, Hester S. Meyer, in the circuit court of Cook county and alleged that he "resides in the County of Cook and has been a resident" thereof for more than one year immediately prior to the filing of his complaint. As grounds for divorce he alleged wilful desertion for the space of over one year and habitual drunkenness for the space of over two years. Answering, she stated that the

proceedings resulting in the divorce decree were an absolute nullity for want of jurisdiction as adjudicated by the Appellate Court; that defendant did not have the legal capacity to enter into a marriage with Constance Arts; that such pretended marriage was bigamous; and that his cohabitation with Constance Arts was adulterous. She denied that she was guilty of desertion or of habitual drunkenness.

On January 10, 1950, after a full hearing the chancellor found that plaintiff was guilty of habitual drunkenness for the space of more than two years prior to the filing of the complaint; that the children had reached their majorities; that Arthur Meyer's cohabitation up to February 17, 1948, under his marriage of May 1, 1943, to Constance Arts was not adultery or bigamy constituting a defense to his complaint for divorce; that Hester S. Meyer had failed to establish that Arthur Meyer was guilty of adultery from and after February 17, 1948, as charged in defendant's new amendment to her answer, and that the equities were in favor of Arthur Meyer and against Hester S. Meyer. The decree ordered that the bonds of matrimony between Arthur Meyer and Hester S. Meyer be dissolved. It recited that the chancellor heard the testimony of witnesses, read documentary evidence and stipulations as to certain facts. Hester S. Meyer, appealing, asks that the decree entered January 10, 1950, be reversed and that the cause be remanded with directions to dismiss the complaint for want of equity. It will be observed that the first case was filed by Hester S. Meyer against Arthur Meyer and that the case before us was filed by him against her. For convenience we will refer to Hester S. Meyer as the plaintiff and Arthur Meyer as the defendant, their positions in the first case.

Plaintiff's amendment to her answer and defendant's reply thereto show that immediately prior to February

17, 1948, defendant and Constance Arts occupied as husband wife apartment 6 at 1018 North State Street, Chicago; that on February 17, 1948, the day the last Appellate Court opinion was filed, he took a room in apartment 7 at 1018 North State Street, Chicago, which was one flight of stairs up and across the hall from the apartment he had formerly occupied with Constance Arts; that he was still occupying this room and Constance Arts was still occupying apartment 6 at the time of the trial of this cause; that for a period of one week in the latter part of March, 1948, defendant and his daughter, Priscilla Meyer, occupied apartment 6 while Constance Arts was out of the city; that defendant and his daughter Priscilla journeyed· to Moline, Illinois, where they spent the days of March 26, 27 and 28, 1948, at the home of some friends by the name of Faulkner, with whom Constance Arts and Katina were visiting; that in June, 1949, he went to Princeton, New Jersey, to attend the graduation exercises of his son Sheldon; that while there he, at the request of Sheldon, invited Constance Arts and Katina to attend the festivities; that defendant says his son offered to obligate himself for the expenses of the trip; that the fact is that defendant paid Constance Arts' and Katina's fare to Princeton by plane and that he, Constance and Katina returned to Chicago by train at defendant's expense; that while in Princeton during the days of June 13, 14 and 15, 1949, the defendant, his daughter Priscilla, Constance and Katina all were quartered at the home of one of the instructors at Princeton University; that defendant has since February 17, 1948, furnished the funds for the upkeep of apartment 6 occupied by Constance Arts and Katina; that he contends that this is for the purpose of having accommodations for his daughter Katina, his son Sheldon and daughter Priscilla when they happen to be in the city; and that this apartment is under the

supervision of Constance Arts. Defendant admits that he is frequently in apartment 6, but states that on each and every occasion his son Sheldon or his daughter Priscilla, or both, or some other friends of Constance Arts are present, and that at no time from February 17, 1948, has he ever been in apartment 6 alone with Constance Arts.

Plaintiff, Hester S. Meyer, did not bring to us a report of proceedings. She contends that the error of the chancellor in granting a divorce appears on the face of the record; that void proceedings are an absolute nullity, confer no rights and afford no protection for anyone claiming or acting under them; that a person having a lawful spouse living and undivorced cannot enter into a valid marriage; that any such marriage is void; that a person marrying on the basis of a divorce has the burden of proving the divorce was valid; that adultery is an absolute defense to a suit for divorce on any ground; that defendant Arthur Meyer is guilty of adultery in cohabiting with Constance Arts for a period of three and a half years after he was put on notice that his divorce and subsequent marriage were void; and that because of his adulterous conduct he cannot obtain a divorce. There is no contention by Hester S. Meyer that the chancellor erred in finding that she was guilty of habitual drunkenness for more than two years prior to the commencement of the complaint for divorce by Arthur Meyer.

We are called upon to determine whether the fact that Arthur Meyer and Constance Arts lived and cohabited together as husband and wife from the time of their marriage on May 1, 1943, until the last opinion of this court on February 17, 1948, constituted adultery as a recriminatory defense against the proof that Hester Meyer was guilty of habitual drunkenness for the space of more than two years prior to the filing of the last divorce complaint. Plaintiff concedes

that without a report of proceedings she cannot question the chancellor's specific finding that she failed to establish that he, Arthur Meyer, was guilty of adultery from and after February 17, 1948, as charged in the amendment to her answer. She urges that the facts relative to defendant's association with Constance Arts after February 17, 1948, are material with regard to his claim that his conduct has at all times been above reproach. In 1945, Sec. 5 of the Divorce Act (Par. 6, Ch. 40, Ill. Rev. Stat. 1949) [Jones Ill. Stats. Ann. 109.173] was amended to permit proceedings for divorce to be commenced in the county where the defendant resides as well as the county where the plaintiff resides. It will be observed that this section is headed by the word "Venue." It was held in the recent case of *United Biscuit Co. v. Voss Truck Lines,* 407 Ill. 488, that (502):

"Provisions relating to venue have nothing to do with jurisdiction of the subject matter, unless the location of the event causing the action is made a part of the definition of the class of actions it may entertain."

That was a transitory case involving a collision on the highway. Sec. 2 of the Divorce Act, (Par. 3, Ch. 40, Ill. Rev. Stat. 1949) [Jones Ill. Stats. Ann. 109.170] is headed "Residence." In the last opinion this court held that the defendant, Arthur Meyer, was precluded from urging "at this state of the litigation" that a collateral attack upon the decree "cannot be maintained." The court held that although neither chancellor made a finding on the question of residence, the evidence warranted only the conclusion that plaintiff, Hester S. Meyer, did not reside in Cook county at the time her divorce complaint was filed. The circuit court had jurisdiction of the subject matter. Whether Hester Meyer was a resident of Cook county was a question

560

of fact. In *Cullen v. Stevens,* 389 Ill. 35, the court said (37) "that plaintiff shall reside in the county where the suit is filed, is a prerequisite to the filing of a complaint in a divorce proceeding." In that case the court also said that the records of a court with jurisdiction to hear and determine divorce cases import verity and, in the absence of proof from its records, its decree cannot be attacked collaterally, as its jurisdiction will be presumed, and that in case of collateral attack all presumptions are in favor of the validity of the judgment or decree attacked and want of jurisdiction to enter the same must appear on the face of the record in order to furnish a basis for collateral attack. The court also pointed out that a collateral attack on a decree must be based on matters on the face of the record without aid from a bill of exceptions or certificate of evidence.

At the time Arthur Meyer married Constance Arts the decree for divorce was in full force and effect. Mrs. Meyer did not file her petition until one week short of 18 months following the entry of the decree for divorce. There was no order for a supersedeas to suspend the operation of the decree. On the face of the record the decree was valid. The only Illinois case with a factual situation approaching that of the instant case, which we have been able to find, is that of *Gordon v. Gordon,* 141 Ill. 160. In that case Ada E. Gordon filed a bill for divorce against her husband George B. Gordon in the circuit court of Cook county on March 2, 1887. Service was had by publication and defendant did not appear. On May 7, 1887, the cause was called for trial and complainant testified as a witness. After the hearing and on the same day she was informed by her solicitor that she had obtained a decree of divorce and he gave her what purported to be a copy of the decree, certified by him as a notary public, and informed her that she had a right to marry. The

561

solicitor went with her to the office of the county clerk and obtained a license. On the same day she was married to Harvey Wilson and cohabited with him as his wife until April 8, 1889. It turned out, however, that no decree was rendered May 7, but on May 27 more evidence was taken and a decree was entered on May 28, 1887. In July or August, 1887, complainant learned that the paper her solicitor furnished her was not a copy of the decree and she then procured a certified copy of the decree of May 28, and in the following January she was again married to Harvey Wilson. On February 7, 1889, the defendant filed a petition to set aside the decree on the ground that it had been obtained by false and fraudulent evidence. On April 13, 1889, the decree was vacated and set aside. On September 19, 1889, the complainant filed her second bill against George B. Gordon, charging him with adultery. One of the questions presented was whether the complainant was guilty of adultery by her marriage with Wilson on May 7, 1887, and her cohabitation with him as his wife until March 2, 1889, when she discovered that her decree for divorce was invalid. The court pointed out that complainant cohabited with Wilson as his wife from May 7 until May 28, a period of 21 days, while she was the lawful wife of defendant, before she obtained a divorce, "so that during this period she cannot claim the protection of any decree either void or voidable as no decree was in existence until May 28, 1887." The court said it would serve no useful purpose to enter upon a discussion whether the decree of May 28 was void or voidable, or whether the cohabitation of complainant with Wilson after the rendition of that decree was adulterous or not, "because if the complainant was not guilty of adultery by cohabiting with Wilson after the decree was rendered, the question would still remain as to the legal effect of her cohabitation before

562

the decree was rendered." The opinion discusses various cases, including *Bailey v. Bailey,* 45 Hun. 278, and said that without stopping to determine whether the rule laid down in that case is the correct one or not, it is manifest the case cannot be regarded as an authority on the question involved for the reason that the cohabitation of plaintiff with Wilson for 21 days was not under a judgment or decree of court. In the *Gordon* case the court said (169):

"The complainant seems to have been a woman of intelligence, and at least of ordinary business capacity. She appeared at the trial on her application for divorce. Wilson, the man she married, was also present, and she had an opportunity to consult with him. There was no difficulty in ascertaining whether she had obtained a decree of divorce, or not. If she or Wilson had gone to the clerk of the court, he would have informed them in regard to the matter. It was the duty of complainant to ascertain and know, before she entered into the marriage relation with another man, that she had procured a divorce. . . . Her marriage with Wilson before she obtained a divorce from Gordon was void. . . . If the marriage of the complainant with Wilson was void, as held in the cases cited, we are aware of no principle upon which it can be held that her cohabitation with him was not adulterous. The marriage with Wilson being void, she occupied the same position that she would have occupied if she had cohabited with him without marriage."

The judgment of the Appellate Court holding that Mrs. Gordon had been guilty of adultery was affirmed.

In the *Gordon* case the Supreme Court carefully avoided discussing whether the cohabitation of Mrs. Gordon with Wilson after the entry of the decree of May 28 was adulterous and based its affirmance on the cohabitation as husband and wife for 21 days when

the parties erroneously thought they had a decree for divorce. It pointed out that Mrs. Gordon would have no difficulty in ascertaining whether she had obtained a decree of divorce and that she could have gone to the clerk of the court for the information. Arthur Meyer and Constance Arts knew that a decree for divorce had been entered. It is true that defendant and Constance Arts continued to live and cohabit as husband and wife after the filing on July 11, 1944, of plaintiff's petition to expunge the decree and that they so continued to live until February 17, 1948, when our last opinion was filed. We are of the opinion, however, that there was no intent to commit adultery. ''The crime of adultery cannot be committed without a criminal intent, but the intent may be inferred from the criminality of the act itself.'' C. J. S. 2, page 476. Defendant Arthur Meyer had a right to rely on the rule that all reasonable presumptions are indulged in favor of the decree. The factual issue raised by plaintiff's petition to expunge and the reply thereto were ruled adversely to plaintiff in two hearings and the case came to this court twice. It would be unjust and unreasonable to hold that the cohabitation of defendant and Constance Arts, under the circumstances shown by the record, constituted adultery. The circuit court in expunging the decree could not alter the fact that the marriage and cohabitation of defendant and Constance Arts took place while the decree was in effect and when there was no supersedeas suspending its operation.

We believe that the views of the court in *Bailey v. Bailey,* 45 Hun. 278 (New York Supreme Court Reports), affirmed on the opinion below by the Court of Appeals of New York, 142 N. Y. 632, 37 N. E. 566, are applicable to the case at bar. Howard and Sarah Bailey were married on December 12, 1867. He sought a divorce on the ground of defendant's adultery. Judg-

ment was rendered for plaintiff on February 5, 1886. A month later he appealed and the judgment was reversed. After the entry of the judgment on the first trial plaintiff married another woman and thereafter cohabited with her until September 17, 1886, when he was notified that the judgment was reversed, whereupon he immediately ceased all marital relations with her. From the judgment in the second trial she again appealed and the court affirmed the judgment. The court said that the question of defendant's guilt of adultery before she became insane was proven. The court said (279):

"It appears that this action was tried before another judge upon charges of adultery with another man, resulting in a judgment in plaintiff's favor, entered February 5, 1886, containing the usual permission that plaintiff might marry again. He availed himself of this privilege, and, in good faith, married another lady with whom he cohabited until September 17, 1886. He then heard that the General Term had decided to reverse the judgment and he, therefore, ceased such cohabitation. The General Term order and judgment were not entered until September 20, 1886. Hence, this cohabitation was wholly within the period while the judgment was in force under the form of a marriage. The charge of adultery against plaintiff is based upon no other suggestion of sexual intercourse. Even this has not been plead as a defense. Perhaps the fact that defendant's insanity at the commencement of this action renders it necessary that the court should take cognizance of the fact of this cohabitation, irrespective of her pleading, is just as in cases of a general answer by an infant. But, in the view which we have adopted, it will become unnecessary to deal with this suggestion. We place our decision on a ground which, if sound, will be more useful to all parties concerned.

"It is now argued in behalf of the defendant that the reversal of the first judgment left the parties in precisely the same legal situation, and all their acts subject to precisely the same legal consequences as if it had never been entered at all. The first part of the proposition may be conceded, but we are unable to assent to the latter part of it. The court certainly had full and complete jurisdiction over the parties and the subject-matter of the action, and there is not the slightest suggestion of any wrong by the plaintiff in obtaining the judgment. . . . There was, therefore, a just and lawful judgment, which, in form at least, annulled this marriage and bound the parties so long as it remained unreversed. It was, apparently, the voice of the law permitting the plaintiff to marry again. . . . Although erroneous, it went into full force and effect on February 5, 1886, and thus remained during the whole period of plaintiff's cohabitation under the second marriage. In other words, while this cohabitation was going on, this judgment was a complete estoppel upon every person interested in the matter from alleging that it was adulterous. No lip could be open to challenge either its morality or legality. And the question then recurs, did the reversal of this judgment in any respect affect the legal or moral character of this *cohabitation?* In other words, can *the law,* in one breath, invite an act, and, in the next, condemn it as illegal and immoral, simply because one of its ministers has made a mistake. It should be observed that the precise point under consideration is the moral and legal character of this *cohabitation,* and that the force and effect of the reversal upon the *legal status* of these parties as husband and wife has no place in the discussion. Of course they were man and wife, and had never ceased to be, for the reason that the law ignores the erroneous judgment upon existing rights so soon as it is blotted out. But not so of

566

the *cohabitation* under the erroneous judgment. That did her no wrong in a legal sense, for the reason that it was an act lawfully done under existing authority of law.

"In the first place the element of voluntary immorality is utterly wanting, just as in cases of complete rape . . . or where the act is accomplished by fraud . . . or while one of the parties is insane. . . . The essence of the act is its voluntary immorality. It is not immoral, for the reason that it is done in good faith and in obedience to the invitation extended by the law itself. To hold otherwise would be to permit the law itself to perpetrate a fraud upon the party who thus cohabited in reliance upon its representation. Such cohabitation, where the parties are fully justified in believing in the innocence and legality of the act, is quite as clearly an honest mistake of fact, as where a woman submits to the embrace of a man honestly believing him to be her husband. . . .

"The point is that wherever the law invites an act, which would otherwise be unlawful, whether it be by express general provisions as through a *valid judgment* which purports to express the law of the particular case, the acts of parties in pursuance thereof are not *illegal,* and especially is connubial cohabitation, under such circumstances, free from the charge of adultery.

"The same results are apparent if the subject is examined from the standpoint of *public* rights, for it would scarcely be contended that this plaintiff could be convicted of bigamy upon his second marriage solemnized while this first judgment was in force. . . . This first judgment took effect *on its entry,* and was then operative to protect this plaintiff from a charge of adulterous intercourse. To hold otherwise would be to say that a judgment for divorce, unlike any other, did not take effect until thirty days after its entry, and not then or for an indefinite period there-

after, if appeals were taken in due time. Of course, the plaintiff and his second wife ran the risk of the reversal of the first judgment, and that risk involved the validity of their marriage and perhaps the legitimacy of the children begotten of it, if any; but it seems an absurdity to say that this defendant, who during the whole period of this cohabitation *was estopped* from asserting that it was otherwise than innocent and lawful, could, after the reversal, be heard to say that it was adulterous and unlawful. The acts which plaintiff performed were not wrongs *against this defendant* at the time when they were done. They were done in reliance upon, and in a certain sense, under legal sanction. Their legal character did not change with the reversal of the judgment. . . . This illustration will alone suffice to show that the general proposition that the reversal operates to obliterate the judgment for all purposes, is too broad and is not of universal application. It operates upon the *status quo* at the time it is entered, but does not give any *new rights* except those to which the idea of restitution may be legitimately applied. Even that right relates only to the *status quo*.

"If one must wait for the expiration of the time for an appeal in such a case, why must he not also wait until the possibility of a new trial for newly discovered evidence shall have passed by the death of contemporary witnesses?

"The fact that a reversal might defeat a second marriage, and possibly bastardize children, is not to the point. That result happens in consequence of the fact that two marriage states for a single person cannot lawfully exist at the same time, and the latter must yield to the former from the necessity of the case. But that is not true of the *character* of cohabitation in reliance on such a judgment as this, because the physical act constituting the intercourse may happen even

568

during a state of unqualified marriage without being adulterous, in the eye of the law.''

See also *Chisholm v. Chisholm,* 105 Fla. 402, 141 Sou. 302; *Pratt v. Pratt,* 157 Mass. 503, 32 N. E. 747. We recognize that in the *Bailey* case there was no contention that the court lacked jurisdiction. However, we are of the opinion that the well reasoned opinion of the court in that case applies with equal force to the instant case.

We find that Arthur Meyer was not guilty of adultery in cohabiting with Constance Arts up to the time the second Appellate Court opinion was filed. The chancellor was right in entering the decree of January 10, 1950. Therefore, the decree of the circuit court of Cook county is affirmed.

*Decree affirmed.*

KILEY and LEWE, JJ., concur.