79 N.J. Super. 388 (1963)
191 A.2d 763
GEORGE A. WELLS, PLAINTIFF-APPELLANT,
v.
MATTIE BELLE ROBINSON WELLS, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued March 18, 1963.
Decided June 6, 1963.
*390 Before Judges CONFORD, GAULKIN and KILKENNY.
Mr. William L. Brach argued the cause for appellant (Messrs. Zucker, Brach & Eichler, attorneys).
No appearance for defendant-respondent.
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an uncontested action for divorce on the ground of the defendant's desertion of the plaintiff. Judge Hand, sitting in the Chancery Division, denied relief on the ground of plaintiff's adultery, he having married another woman after his wife left him and cohabited with her continuously up to and at the time of the trial. (For aught we know that cohabitation continues to this day.)
*391 Plaintiff gave the following testimony. He married the defendant, Mattie Belle Robinson Wells, in Florida, the state of his birth, in 1929. They had one child. In 1933 she left him without cause over his objection. He wrote her several times in North Carolina asking her to return, but received no reply. He did not go there to see her. Later he moved to New Jersey, and in 1944 he entered into a ceremonial marriage with a woman now known as Ruby Wells with whom he has lived as man and wife ever since in Newark. They have no children. In or about March or April 1961 his wife's whereabouts came to his attention when she telephoned his brother from Detroit upon reading about the death of another brother. Plaintiff's counsel frankly explained in his opening to the trial court that he advised the bringing of this action to eliminate any title questions in connection with "a property transaction" for plaintiff and Ruby Wells. The complaint was filed July 3, 1961.
The matter was heard in the Chancery Division December 5, 1961 and February 9, 1962. Upon plaintiff's testifying to the foregoing facts the trial judge regarded it as his duty to have plaintiff particularize what was clearly to be implied from his testimony and from counsel's opening  that he was still cohabiting with Ruby as of the time of the trial, as late as February 9, 1962, notwithstanding he had filed an action in the Superior Court several months before alleging that he was lawfully married to Mattie and praying a divorce from her for her alleged desertion. After considering the matter, Judge Hand filed an opinion concluding that the action must be dismissed by reason of the recriminatory defense of adultery arising out of the continued cohabitation of plaintiff and Ruby after he learned early in 1961 that his wife Mattie was still alive. Wells v. Wells, 73 N.J. Super. 545 (Ch. Div. 1962), commented upon in 17 Rutgers L. Rev. 456 (1963).
Although the trial court did not rest its decision on the cohabitation of plaintiff and Ruby during the years before he learned that Mattie was still alive, but only on the subsequent relations between them, plaintiff is at pains on this appeal to *392 develop the point that the earlier period of cohabitation was not adulterous because of the entry of plaintiff and Ruby into the ceremonial marriage relationship in good faith and armed with an asserted statutory presumption that Mattie was dead. For purposes of this appeal it will not be necessary to determine whether, under the facts presented, the relationship with Ruby was adulterous prior to the coming to light of Mattie's continued existence. A persuasive argument can be made that it was not if one assumes that which here is attended by considerable doubt  that plaintiff made such reasonably thorough inquiries concerning the whereabouts of his wife as justified him in a bona fide belief that she was actually dead when he remarried. See Smith v. Smith, 64 Iowa 682, 21 N.W. 137 (Sup. Ct. 1884); Meyer v. Meyer, 343 Ill. App. 554, 99 N.E.2d 706 (Ill. App. Ct. 1951); Geisselman v. Geisselman, 134 Md. 453, 107 A. 185, 188 (Ct. App. 1919); cf. N.J.S. 2A:92-1, negating the crime of bigamy upon a good faith remarriage after five years' absence of the spouse. Our affirmance of the judgment, however, will rest, as did the determination of the trial judge, on the continued cohabitation by plaintiff with Ruby after knowledge that Mattie was alive and pending the divorce action.
Obviously, any arguable presumption under N.J.S. 3A:40-1 as to Mattie's death prior to the marriage to Ruby was dissipated upon the establishment below of the fact of Mattie's survival in 1961. See Simmons v. Simmons, 35 N.J. Super. 575, 582 (App. Div. 1955). Moreover, plaintiff affirmed the fact of Mattie's survival and of the continued subsistence of a legal marital status between them when he filed his complaint in this action.
Further, although we do not here have to decide whether plaintiff married Ruby in good faith in 1944, we cannot accede by silence to plaintiff's argument that the cited statute supports plaintiff's justification in having remarried without first obtaining a divorce from his absent wife. The statutory presumption of death from seven years' unexplained absence operates only when the fact of life or death of the *393 absentee becomes material in an action, not before or otherwise. Spiltoir v. Spiltoir, 72 N.J. Eq. 50, 52 (Ch. 1906). As was stated in the cited case in reference to the effect of the statute upon a person in a position like that of the present plaintiff before his second marriage: "A person situate as is the petitioner here, who marries again without procuring a divorce, does so entirely at his or her peril as to the validity of the marriage * * *." (at p. 53).
We find Judge Hand's determination in this case to have been a conscientious and correct discharge of his responsibility notwithstanding his sympathies admittedly lay with the plaintiff. The State is a third party in every divorce case, interested in the maintenance of the marriage relationship, and it is the duty of the trial judge, even in an uncontested case, to see to it that a divorce is not granted except where warranted on the statutes and the proofs. In re Backes, 16 N.J. 430, 433-434 (1954); Kress v. Kress, 1 N.J. 257 (1949); Welch v. Welch, 35 N.J. Super. 255 (App. Div. 1955); Francis, J., dissenting, on other grounds, in Schlemm v. Schlemm, 31 N.J. 557, 585 (1960). Further, as stated by Mr. Justice Francis, ibid., "So grave is the judicial obligation that its satisfaction requires `that all proper defenses be made or compelled.' Giresi v. Giresi, 137 N.J. Eq. 336, 341 (E. & A. 1945)."
Although generally the defense of recrimination must be pleaded to be availed of by a defendant, a recognized exception is that "the relief prayed for by the petitioner will not be granted, notwithstanding that recrimination is not set up as a defense, if he in putting in his case shows his own guilt." Young v. Young, 94 N.J. Eq. 155, 157 (E. & A. 1922). The case on appeal before us presents precisely that state of affairs. The rationale of the exception, as declared in Young, "is that when the complainant himself shows that he is in pari delicto and does not come into court with clean hands, a court of justice will not grant him the relief to which he would otherwise be entitled." Ibid.
*394 The same approach has been adopted in annulment cases by our courts. A complainant who continues to cohabit with a person he has married after learning of an unremoved impediment to the marriage will be barred by unclean hands from thereafter seeking an annulment of the marriage even though the cohabitation was innocent in intent when begun. Keller v. Linsenmyer, 101 N.J. Eq. 664, 672 (Ch. 1927); Endres v. Grove, 34 N.J. Super. 146, 148 (Ch. Div. 1955); see Dacunzo v. Edgye, 33 N.J. Super. 504, 518 (App. Div. 1955).
These principles are apt here and require an affirmance of the judgment appealed from notwithstanding that a superficial view of the situation may generate concern with plaintiff's plight. The settled law and public policy are not ours as individual judges to apply or ignore as the exigencies of isolated litigants move us. The decision of a particular case not only determines the matter at hand but is a solemn declaration by the judicial establishment of our law and public policy. Here plaintiff's unclean hands are aggravated by his continued cohabitation with Ruby, not merely after learning that she was certainly not his wife, but even after filing an action for divorce acknowledging that fact and while awaiting favorable action from the court on his complaint. The court is practically treated as a ministerial agency expected to rubber-stamp approval of a fait accompli, as it were, and this on no stronger ground than that plaintiff did not know any better.
We cannot accede to plaintiff's cynical argument that this decision will merely encourage perjurious denial of cohabitation by plaintiffs in similar future cases. It is not unreasonable to expect a plaintiff in such a situation to cease cohabitation with the other woman temporarily when he learns the facts and while awaiting the court's decision on his prayer to be freed from the ties of his lawful existing marriage. In a comparable situation it has been stated that "[a] regard to public decency, as well as the settled usage of the court, requires that under such circumstances the parties should not *395 live together." Keller v. Linsenmyer, supra (101 N.J. Eq., at p. 672).
There being no doubt as to the declared law and public policy of this State in the premises here disclosed, the judgment of dismissal must be
Affirmed.
GAULKIN, J.A.D. (dissenting).
Judge Hand said "[a]s a practical matter, it does seem that plaintiff might well deserve favorable, equitable consideration after some 18 years of a compatible matrimonial relationship with Ruby and that this relationship might well be invested with legality, rather than being consigned to the status of an illegal relationship." (73 N.J. Super., at p. 549) Let us look at the facts which led him to express such sympathy and regret.
Plaintiff is a working man with a third grade education. He married Mattie Belle Robinson (hereafter Mattie) in Vero Beach, Florida in 1929. She bore him a son, but she nevertheless deserted him in 1933, leaving the child with him. He continued to reside in Vero Beach until his marriage with the second Mrs. Wells (Ruby) in 1944. It is not disputed that plaintiff married Ruby in good faith believing Mattie dead.
Plaintiff and Ruby established a good home, made friends and a place in the community as husband and wife, worked hard, saved, and in 1957 bought a home. During his handling of the purchase, Mr. Brach, plaintiff's attorney, learned of Mr. Wells' previous marriage. Mr. Brach advised plaintiff, as he says in his brief, to commence this action "in order to permanently and finally determine his status, remove questions as to title and property, permit in the future determination as to social security rights and other rights between himself and Ruby Wells and finally to provide Ruby Wells as well as himself with the basis of knowing that their marriage was valid and subsisting." Mr. Brach made inquiry in accordance with the rules of court and was unable to locate the defendant, but, while the divorce action was pending, Mattie's whereabouts was discovered when she made a condolence call upon a relative *396 of Mr. Wells. Thereupon Mr. Brach had her served personally with a copy of the summons and complaint in Detroit, but she entered no appearance.
As behooves an ethical lawyer, Mr. Brach told Judge Hand the foregoing facts. For this, Judge Hand properly commended Mr. Brach "for his forthrightness and diligence" (73 N.J. Super., at p. 549) and refused his client the divorce.
No one told this simple unlettered plaintiff to leave Ruby and their home when he learned that Mattie was still alive. As might be expected, it never occurred to him that the law required him to do so after having lived with Ruby for 18 years.
Mr. Wells has been denied the divorce, not because he lived with Ruby for 18 years, but because he continued to live with her for the few months after he knew that Mattie was still alive. The effect of this is that plaintiff remains married to Mattie, who does not want him, did not appear to contest the divorce, and showed no interest in the proceedings. For all that appears, she may have obtained a divorce from plaintiff and/or she herself may have again married.
A plaintiff's condoned adultery is not a defense. Since Mattie kept sufficiently close watch over the Wells family to know of the death of one of them, it is reasonable to assume she knew of plaintiff's remarriage and cared nothing about it. Certainly she did not expect him to be celibate since 1933, and she no more expected him to leave Ruby when he learned of her existence then she expected to change her own way of life because she was sued for divorce. Mattie, in turn, is (at least so far as New Jersey is concerned) indissolubly wedded to plaintiff. The innocent Ruby, who has been a faithful wife for 18 years, must either separate herself from Mr. Wells or live with him in sin, and, of course, the same is true of Mr. Wells.
Now let us see whether we are really compelled to do this "injustice according to law." Our precedents have committed us to the acceptance of the defense of recrimination, but only when it is pleaded and proved by the defendant or appears *397 affirmatively in the plaintiff's case. Young v. Young, 94 N.J. Eq. 155 (E. & A. 1922). However, I disagree that our public policy or the precedents make inescapable the automatic and mechanical enforcement of that doctrine, without regard to the equities arising out of the facts.
That the interposition of recrimination is not a matter of public policy (as is the invocation of collusion, for example) is evident from Young v. Young, supra. An examination of that case reveals that it is a matter of indifference to the court whether recrimination is pleaded or not; when it is not pleaded in defense, the defendant will not be permitted to prove it, even though the defendant brings it to the attention of the court at the trial. Contrast that situation with the matter of collusion, to which public policy does attach. It seems to me to follow that the interposition of recrimination is therefore not a matter of public concern, and certainly not something which the court should raise sua sponte.
But, says the majority, "the rationale of the application of the defense of recrimination in circumstances like these is the doctrine of unclean hands," and unclean hands is also a matter of public policy. However, it must be remembered that "unclean hands" is not automatic and mechanical, but allows room for equitable considerations arising out of time, place and circumstance. We so held just a few days ago, in Warrender v. Warrender, 79 N.J. Super. 114 (App. Div. 1963):
"It is now settled that in deciding whether estoppel or unclean hands will apply in a particular set of facts the court will appraise the `total situation' and will weigh the equities of the parties and others affected, as well as the interests of the State, with flexibility. Second Untermann case, supra, 43 N.J. Super., at pp. 109, 110."
27A C.J.S., Divorce, § 67, pp. 229-230 says that "* * * the doctrine of recrimination, like the doctrine of unclean hands of which it is part, is neither puristic nor mechanical, but an equitable principle to be applied according to the circumstances of each case and with a proper respect for the paramount interests of the community at large." I am not *398 convinced that any case has thus far conclusively established that this is not the rule in New Jersey, and that we must apply recrimination blindly and mechanically, no matter how cruel the result. We certainly do not apply unclean hands in that fashion in other situations. See, for example, Staedler v. Staedler, 6 N.J. 380 (1951); Lawrence v. Lawrence, 79 N.J. Super. 25 (App. Div. 1963); Medical Fabrics Co. v. D.C. McLintock Co., 12 N.J. Super. 177, 180 (App. Div. 1951); Pennello v. Pennello, 97 N.J. Eq. 421 (Ch. 1925).
The doctrine of recrimination has been established by the courts, and not by the Legislature (except in the case of adultery as a bar to adultery, N.J.S. 2A:34-7). As an intermediate court, we have no right to disregard those precedents, but, since the rule is not based on public policy, we are privileged to take a close, hard look at its scope to see whether it really compels us to ratify the injustice which the trial judge said, with great compassion, he regretted he was compelled to do to Mr. Wells. And, it seems to me, a close, hard look is especially warranted here since the severe application of the rule is of such doubtful merit. It has been trenchantly criticized, and modified in most jurisdictions. 17 Rutgers L. Rev. 456 (1963); 11 N.J. Practice (Herr, Marriage, Divorce and Separation) (3d ed. 1963), § 1331, p. 576, citing 58 N.J.L.J., p. 297 (1935) and 66 N.J.L.J. 233 (1943); 17 Am. Jur., Divorce and Separation, § 263, pp. 441-443 (1957); DeBurgh v. DeBurgh, 39 Cal.2d 858, 250 P.2d 598 (Sup. Ct. 1952). The criticisms have been summed up in 17 Am. Jur., supra, at pp. 441-442 as follows:
"At one time it was an almost universal rule in this country, and it still is the rule in several states, that recrimination is an absolute bar to the granting of a divorce. Such early view that recrimination is an absolute defense, to be applied without discretion, has frequently been condemned. When both parties have committed marital offenses it is generally obvious that the marriage is beyond salvage; yet the rule that recrimination is an absolute defense leaves the parties legally bound to each other. This situation produces many evils: it promotes adulterous relationships; it increases the danger of giving birth to illegitimate children; it encourages collusive and *399 uncontested divorces; it exerts a corrupting influence on the negotiations that precede a default divorce case, including the exaction of an unfair property settlement or alimony arrangement; and in community property states it leaves the management of the community property in the hands of the husband. In recognition of these facts, several courts now hold that recrimination is merely a discretionary defense, or that the doctrine of comparative rectitude should be applied; and in several states the legislatures have enacted that recrimination shall be a discretionary defense, or that it shall be a defense to some grounds but not to others, or they have entirely abolished the defense."
In addition, we have here the further fact that the defense was not interposed by the defendant but was injected into the case by the trial court, over the protest of Mr. Brach. The case had already been fully heard, on two separate dates, and the plaintiff had rested. A month later, the trial judge, on his own motion, reopened the case and summoned the plaintiff for further interrogation on February 9, 1962. Prior to that time there had been no warning to the plaintiff or his counsel, that plaintiff's continued cohabitation with Ruby might be counted against him. The trial judge felt that he was compelled by Young v. Young to interrogate him about it.
Before the hearing of February 9 no evidence had been introduced that plaintiff had had sexual relations with Ruby after he learned of the existence of Mattie. It is true that plaintiff had testified that he had continued to live in the same house with Ruby after he learned of the existence of Mattie, but the trial judge obviously did not think that evidence enough to establish adultery after the knowledge that Mattie was alive (cf. Helbig v. Helbig, 103 N.J. Eq. 348 (E. & A. 1928)), for he ordered plaintiff to appear again on February 9, 1962, at which time he put to Mr. Wells the fatal questions, over the strenuous objection of Mr. Brach.
The history of the law teaches us that mechanical rules spawn arbitrary exceptions, to avoid the harshness which arises out of their universality. If the New Jersey rule of recrimination is as mechanical, inflexible and harsh as the *400 majority says, Young v. Young is an example of such an ameliorating exception. I take Young v. Young to mean that if Mattie had appeared, but had not pleaded recrimination, she would not have been permitted, over plaintiff's objection, to prove it. If such proof, offered by Mattie, had been allowed, Young v. Young would be authority for the reversal of the judgment. Why should the result be different because the judge undertook to do (probably against Mattie's wishes) what Mattie herself could not do?
It does not seem to me that what the denial of the divorce does to plaintiff and his wife of 18 years advances our public policy. On the contrary it seems to me opposed to the public policy declared when parallel situations are presented in other courts. For example, had Mr. Wells been killed in the course of his employment, we would hold that there was the strongest possible presumption that the marriage to Ruby was valid, and we would draw all possible inferences to rebut any attack on the validity of that marriage, even after Mattie's reappearance.
In short, I would reverse and order the entry of judgment of divorce in favor of plaintiff.