103 N.J. Super. 218 (1968)
247 A.2d 28
X, PLAINTIFF,
v.
Y, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 8, 1968.
Mr. Abraham H. Carchman, for plaintiff (Messrs. Carchman, Sochor & Carchman, attorneys).
*219 Mr. Harold J. Brown, for defendant (Messrs. Joyce and Brown, attorneys).
HARTMAN, J.C.C. (temporarily assigned).
In 1956 defendant (Y) deserted plaintiff wife (X). In 1961 she gave birth to an illegitimate child. She now seeks an absolute divorce based on the husband's desertion, a cause of action which had accrued to her in 1958. The question to be determined is whether the trial court should, sua sponte, apply the doctrine of recrimination as a bar to her action and dismiss her complaint. I have decided that the factual circumstances present here require the exercise of judicial discretion to disregard her adultery and to grant the divorce.
The testimony in this case establishes the following facts: The parties were married in Montclair, N.J., on February 7, 1948. Plaintiff was then, and has continued to be, a bona fide resident of this state. Four children were born of that marriage: A, 19 and now married; B, 18; C, 15, and D, 13; except for A, they have been in her continuous custody since the date of her marriage. The wife was deserted by her husband on September 1, 1956, and this desertion was a willful, continued and obstinate one. Shortly after the desertion she filed a complaint in the Juvenile and Domestic Relations Court of Essex County seeking support which was granted to her. The record of that court's proceedings reflects numerous defaults, contempt motions and continuing arrearages. On September 1, 1958 there accrued to plaintiff a cause of action for divorce which she did not pursue. Her explanation satisfies me that she was ignorant of divorce proceedings, was working hard to support her family, had no one to advise her, and gave no thought to it. She has had only a grammar school education.
Defendant's desertion of his wife and family was complete. From the day he left them he made no attempt to see or communicate with his children. Anniversaries, birthdays, holidays, and Father's days have come and passed without a single token of his concern or his very existence. Yet, he *220 remained until recently an employee in the sanitation department of an Essex County Borough. A, the oldest child, was seven when her father left; she barely remembers him. The younger three children have no recollection of him at all.
Sometime in 1960 plaintiff became acquainted with a man (Z). Z in 1956, while a member of the armed forces, met and married a girl in South Carolina. Three months later she deserted him. There were no children of that union. In any event, at the time he became acquainted with plaintiff he found her home to be barely and inadequately furnished. Z, although an unlettered man, has always been steadily employed. The lack of furniture in the X/Y home was soon remedied by him. The children no longer sat on orange crates. He furnished their home; the children took to him; he encouraged them to do their school homework; he brought the "family" into his church where he is a trustee and the treasurer; plaintiff became a singer in the choir, and the family became regular attendants in his church. In 1961 plaintiff bore a child by Z. This child has been raised with the X/Y children.
The oldest child, A, corroborated Z's role as a father to this family and to the excellent relationship between the children and Z. He bought their food and clothing, pushed them "hard" to study, disciplined them as they were growing up, and saw to it that they attended church services. The pastor of their church was shocked on learning during these proceedings that the X/Z relationship was not that of a legal marriage. He had always thought of them as married, of fine character, with high moral standards; regular church goers and active in its affairs.
I now come to a rather unusual aspect of the factual complex of this case. During a routine visit of the X/Y home, apparently connected with Y's support order in the Juvenile and Domestic Relations court, a probation officer learned of the existence of the fifth child in that household. As a result of this officer's expressed views Z left the home. Faced with the need to find quarters for himself, and at the same *221 time to continue his support of the X/Y family, he decided to buy a piece of property. Legal advice pointed out the risk of taking title in his own name since it would create a possible dower interest in the wife he still had in South Carolina. If he took title in X's name there was a similar risk in creating a possible curtesy interest in Y. He sought out Y, told him he wanted to take title in X and asked him to release any curtesy interest in that property in view of the fact that he, Z, carried the major support burden for Y's children. Y agreed, and Z then purchased a three-family home in Newark. He set up quarters for himself and X's elderly mother in the first-floor apartment; X and the five children moved into the apartment on the second floor, and the third-floor apartment was rented out. The property is still tenanted in this fashion and Z is paying better than $173 a month towards the mortgage and real estate taxes. The title stands in the name of X, and Y's release of his curtesy interest is duly recorded.
Z, hoping to be free of his deserting spouse so that he could marry X, filed a complaint for divorce against his wife on the ground of desertion (Docket M-6398-66). On the same date, May 10, 1967, X filed her action for divorce against her husband. In the Z case service was effected on his wife in South Carolina. Failing to answer or otherwise appear, a default was entered against her. Between the first and the continued trial date in his case, Mrs. Z passed away. Her death was proved and duly noted on the record. The action having thus abated, Z's complaint was dismissed. He is now free to marry.
In the X/Y case the defendant husband was served personally in this State. He filed an answer denying the desertion. Curiously, the answer contained no separate defense of recrimination despite the fact that he knew of, or had reason to inquire about, X's relationship to Z. Incidentally, a case worker for the Essex County Welfare Board induced a woman, T, to file a complaint in the Juvenile and Domestic Relations Court (Docket M-4529), on May 31, 1966, charging *222 Y as the father of her seven-year-old illegitimate child, with nonsupport. Defendant had been adjudicated as that child's father in the Newark Municipal Court on October 10, 1962. On November 23, 1966 defendant was ordered to pay support. A bench warrant issued for his arrest, but he was not apprehended.
Thereafter, Y's attorney applied to be relieved for the reasons that all efforts to have his client cooperate in preparing his defense had failed; defendant had retired from his job and had left New Jersey and gone west. An order was entered relieving defendant's attorney, and the X case was scheduled for trial as an uncontested case on the same day that the Z case was scheduled for a hearing.
X and Z desire the opportunity to be free to legally marry. Such a marriage would legitimatize their child. Z also wants to adopt the three remaining unemancipated X/Y children. They have discussed the matter with the children, who have indicated they would welcome such adoption.
All the foregoing facts were brought out at trial by the respective plaintiffs in a frank and open manner. Their attorney withheld nothing in the atmosphere of final hearing; this in itself was unusual and refreshing.
In England, prior to the Reformation, the dissolution of marriage was pronounced by the ecclesiastical courts which applied the canon law of the Roman Catholic Church. The Church's doctrine of the indissolubility of marriage, although it did not prevent them from annulling a marriage, did prevent them from granting an absolute divorce. The only divorce available to a spouse in the ecclesiastical courts was a divorce a mensa et thoro, the type variably referred to as a judicial separation, a limited divorce, or a divorce from bed and board; remarriage was not permitted.
By the Matrimonial Causes Act of 1857, the jurisdiction in dissolution cases was transferred from the ecclesiastical courts to the new Divorce Court set up by that act and, since the Judicature Acts of 1873 and 1875, it has been vested in the High Court, assigned to the Probate, Divorce and Admiralty *223 Division. Bromley, Family Law (2d ed. 1962), pp. 55-56.
In the ecclesiastical courts, the fact of a plaintiff's adultery was an absolute bar to a bed and board divorce  this on the principle that plaintiff's conduct disentitled that party from relief claimed on the basis of defendant's matrimonial offense.
When we declared our independence from the mother country in 1776 we adopted as our law the common law of England. Constitution of 1776, par 22. At that time the courts in England were not empowered to grant divorces; that jurisdiction was then vested in the ecclesiastical courts and only to the extent of granting bed and board, not absolute, divorces. Consequently, the doctrine of recrimination was never applicable to the forbidden absolute dissolution of marriage and was not part of the common law. The courts in England were not given authority to grant divorces until 1857 when jurisdiction was removed from the ecclesiastical courts. New Jersey's first Divorce Act of December 2, 1794 (Pat. Laws 143), granting jurisdiction to the Court of Chancery, provided in section 5 that no divorce should be decreed if it appeared to the court that both parties were guilty of adultery. N.J. Practice (Herr-Lodge, Marriage, Divorce and Separation) (3d ed. 1963), § 1331, n 10. Our present statute, N.J.S. 2A:34-7, provides that "[I]f it appear to the court * * * that both parties have been guilty of adultery not condoned, no divorce shall be adjudged." No statute has ever been enacted in this State which would apply the principle of recrimination as an absolute bar to offsetting matrimonial offenses except adultery versus adultery. Although the doctrine came to us as part of the unwritten law, Huster v. Huster, 64 N.J. Super. 29, 34 (App. Div. 1960), ecclesiastical law has been followed in case where equitably acceptable in the absence of statute. In re Anonymous, 32 N.J. Super. 599 (Ch. 1954).
In Wells v. Wells, 73 N.J. Super. 545 (Ch. Div. 1962), an uncontested default divorce case, the trial judge raised, *224 sua sponte, the issue of recrimination by reason of facts brought to light by plaintiff's own testimony, and dismissed the complaint. This decision was affirmed on appeal in the Appellate Division by a 2 to 1 majority. 79 N.J. Super. 388 (1963). In his dissenting opinion in that court Judge Gaulkin pointed out that "[T]he doctrine of recrimination has been established by the courts, and not by the Legislature (except in the case of adultery as a bar to adultery N.J.S. 2A:34-7)"; the rule is not based on public policy, except as to the statutory bar, and neither public policy nor the precedents "make inescapable the automatic and mechanical enforcement of that doctrine, without regard to the equities arising out of the facts."
Judge Gaulkin also pointed out that if the rationale of applying the defense of recrimination is the doctrine of unclean hands, this doctrine, although a matter of public policy, "is not automatic and mechanical, but allows room for equitable consideration arising out of time, place and circumstance," citing Warrender v. Warrender, 79 N.J. Super. 114 (App. Div. 1963).
Wells was then appealed to our Supreme Court where it was reversed unanimously per curiam, 41 N.J. 594 (1964), the court being "generally in accord with the dissenting opinion of Judge Gaulkin." The court held that
"Assuming that a court ordinarily has discretionary power to raise, sua sponte, a recriminatory bar to plaintiff's cause of action for divorce, we agree that the judge should not have exercised that discretion under the factual complex here present." (at p. 595)
I take it from the Wells decision that, until such time as the law may be otherwise declared, the trial judge may weigh the application of the doctrine of recrimination against equitable considerations flowing from the peculiar facts and circumstances of each case, and exercise judicial discretion to apply the bar or not. Such decisions, however, are not readily attainable; we are not provided with precise guidelines or standards. What is judicial discretion? Bouvier's *225 Law Dictionary (Rawle's Rev. 1914), describes it in various ways. For example:
"The power exercised by courts to determine questions to which no strict rule of law is applicable but which, from their nature, and the circumstances of the case, are controlled by the personal judgment of the court."
Again:
"The discretion of a judge is said by Lord Camden to be the law of the tyrants: it is always unknown, it is different in different men; it is casual, and depends upon constitution, temper and passion. In the best, it is oftentimes caprice; in the worst, it is every vice, folly, and passion to which human nature is liable. * * * But the prevailing opinion is that discretion must not be arbitrary, fanciful, and capricious; it must be legal and regular, governed by rule, not by humor; * * *."
I have had at least 20 uncontested cases in the last two years where plaintiff's own testimony disclosed adultery committed by plaintiff. In a good number of them these disclosures appeared from the records and files of prior actions between the parties in the Juvenile and Domestic Relations court. These were orthodox cases and clearly required dismissals of the complaints. Unfortunately, in practically all of them it is the poor people of our communities who are affected; the more affluent have the means to avail themselves of other and easier jurisdictions. There are no doubt countless cases where plaintiff's misconduct is deliberately withheld from the courts, and still others involving collusion, perjury and deceit.
The present case was the first to reach my court to give me concern. The factual pattern, candidly and openly disclosed, seemed to call for a decision which would afford otherwise decent people to make a new life for themselves and to give legality to their apparent status in the community.
I have examined the law of England and find there definitive standards used by the judges in the exercise of judicial *226 discretion which may well be applied by us with regard to the discretionary bar of recrimination.
This doctrine of recrimination was not carried over into the court system as an absolute bar in the law of England. By the Matrimonial Causes Act of 1857 recrimination was made a discretionary bar and continues so to be. Matrimonial Causes Act, 1965, c. 72, § 55(4)(b); 45 Halsbury's Statutes of England, (2d ed.), p. 452 (1965).
"In 1943 the House of Lords set out five considerations which the court should have in mind when exercising its discretion. Those considerations are:  (1) the position and interests of any children of the marriage; (2) the interests of the parties with whom the petitioner has been guilty of misconduct, with special regard to the prospects of their future marriage; (3) the question whether on the withholding of a decree there is a prospect of a reconciliation between husband and wife: (4) the interest of the petitioner, and in particular, the interest that the petitioner should be able to remarry and lead a respectable life; and (5) the interests of the community at large, to be judged by maintaining a true balance between respect for the binding sanctity of marriage and the social considerations which make it contrary to public policy to insist on the maintenance of a union which has utterly broken down." 12 Halsbury's Laws of England (3d ed., 1955) § 623, pp. 311-312.
Testing these considerations against the established facts in this case I conclude, firstly, that the interests of the X/Y children will be best served by continuing Z in the role of their father. He is the only father they have known. He has helped to develop them and to shape their personalities. To deny a divorce to X, and so deny her an opportunity to marry Z, would result in depriving the X/Y children of their "father," a loss bound to disrupt their lives and deeply upset them. Secondly, the proposed marriage between X and Z, if she is adjudged free to marry, will establish a legal home. Thirdly, the marriage between X and Y is concededly bankrupt and beyond any prospect of reconciliation. Fourthly, a new marriage will establish respectability in a community where they are already assumed to be respectable. Fifthly, society can only benefit by a legal relationship between these people and their children. Added to these considerations *227 is the importance of making legitimate the Z-X child by affording them the opportunity to engage in a ceremonial marriage. Lastly, the adoption of the X/Y children by Z would make possible one family at last and an opportunity to develop decent and law-abiding citizens.
Equitable considerations dictate that the court exercise its judicial discretion by not applying the doctrine of recrimination under the factual pattern of this case. I will grant a divorce to plaintiff for the cause of desertion as charged in her complaint.